### THE STATE v. ERNEST JOHNSON, Appellant.

Division Two, December 20, 1926.

CIRCUMSTANTIAL EVIDENCE: Connection with Murder: Suspicion. Between eight and nine o'clock at night on December 23rd a load from a shotgun was fired through a window, and deceased was killed. The ground was soft and muddy; the next morning it was frozen. The tracks of someone were then discovered near the window; as they approached the window he appeared to have been walking; in going away he seemed to have run, the tracks were further apart and were deeper in the mud. A witness who lived a quarter of a mile from the house had been hunting and when he returned home between nine and ten o'clock at night he found a rubber overshoe in his yard; the next morning he found its mate. Both were placed in the tracks around the house of deceased, and fitted exactly. The defendant was arrested, his shoes taken off, and they showed that they had been worn with rubbers over them. The shoes taken off defendant had the "Goodyear Wingfoot" rubber heels and Ponca soles; the imprint of the rubber heels were in the overshoes, and the imprint of the lettering was plainly to be seen. In one of the shoes was a bent tack; there was a corresponding imprint in the overshoe, and the imprint of the tack was likewise plainly to be seen. A brother of defendant came to a store a day or two before the murder, with defendant, and bought overshoes of the same size and kind as those found by the witness in his yard. Defendant had frequently threatened the life of deceased, the threats extending from a year or two to within a few days before the murder, the motive being that deceased had "turned him in for making whiskey." The inference to be drawn from the fact that the murderer wore overshoes until he was

safely away from the place and then threw them away is that his purpose was to prevent being tracked by bloodhounds. **Held,** that the very positive connection of the overshoes with the shoes which defendant wore, and the lack of evidence to break the logical connection of defendant with the overshoes, and the positive evidence of threats and motive, made the question of defendant's guilt one for the jury, and the verdict cannot be set aside by the appellate court. And a mere suspicion that the witness who found the overshoes in his yard was the murderer is not enough to destroy the effect of the circumstances connecting defendant with it.

Corpus Juris-Cyc. References: Criminal Law, 16 C. J., Section 1227, p. 620, n. 54; Section 2291, p. 930, n. 93; p. 931, n. 2; Section 2293, p. 932, n. 13, 14. **Homicide,** 30 C. J., Section 539, p. 295, n. 15; Section 540, p. 296, n. 19; Section 542, p. 298, n. 47; Section 570, p. 322, n. 65.

Appeal from Laclede Circuit Court.—*Hon. C. H. Skinker,* Judge.

AFFIRMED.

*Phil M. Donnelly* and *Page & Barrett* for appellant.

(1) All the circumstances proven must be consistent with each other, consistent with the hypothesis that accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other hypothesis except that of guilt. State v. Francis, 199 Mo. 671; State v. Worney, 196 Mo. 43; State v. Miller, 264 Mo. 441; State v. Singleton, 294 Mo. 346. Circumstantial evidence is insufficient to convict if it can be reconciled with a theory that some person other than the defendant may have done the killing, where such theory is based on the evidence. Bowen v. State, 140 Ala. 65. In order to warrant a conviction on circumstantial evidence it is necessary to prove the circumstances by facts and not by circumstances. A presumption of fact cannot be based upon a presumption. State v. Lackland, 136 Mo. 26; Burtch v. Wabash Ry. Co., 236 S. W. 343; State v. Cox, 250 S. W. 551. Every essential fact in the chain of circumstantial evidence must be proven to warrant a conviction. State v. Crabtree, 170 Mo. 642; State v. Ruckman, 253 Mo. 487. (2) The character of footprints at the scene of a crime and the fact that they correspond with those made by the defendant may be put in evidence, but such evidence is not by itself of any independent strength, but is admissible with other proof if tending to make out a case. 2 Wharton's Criminal Evidence (10 Ed.) pp. 1553, 1554, 1799. At least, tracks of this character are of no value unless sustained by proof that the shoe in question was worn by the accused at the particular time. 2 Wharton's Criminal Evidence (10 Ed.) p. 1555; Cummings v. State, 110 Ga. 293. The above ruling is especially true unless there is some peculiarity in the tracks sufficient to distinguish them from the tracks of other men. Lindsey v. State, 70 S. E. 114.

*North T. Gentry*, Attorney-General, and *J. D. Purteet*, Special Assistant Attorney-General, for respondent.

(1)  Circumstantial evidence, standing alone, is sufficient to support a conviction for the felony of murder.  Such a conviction is justified when the *corpus delicti* and the appellant's guilty agency in the crime have been established.  When a conviction for a felony rests altogether upon circumstantial evidence, as in this case, the circumstances proved must be consistent with each other, consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent and with every other rational hypothesis except that of guilt.  State v. Singleton, 294 Mo. 347; State v. Morney, 196 Mo. 49; 12 Cyc. 488.  (a)  This court, in passing on the sufficiency of the·evidence, to sustain such a conviction, takes and considers the State's substantial testimony which tends to implicate the accused, as being true, and every legitimate inference which may reasonably be drawn from it is indulged.  State v. Fogg, 206 Mo. 696; State v. Page, 212 Mo. 224; State v. Sassaman, 214 Mo. 695; State v. Concelia, 250 Mo. 411; State v. Millsap, 276 S. W. 625.  (b)  Evidence of threats by appellant against deceased's life were admissible for the purpose of showing motive for the crime. State v. Ruckman, 253 Mo. 487; State v. Millsap, supra.  (c)  The evidence surrounding the shoes, the overshoes, and the foot-tracks at the scene of the killing, was admissible and competent to show the consistency of all the circumstances of the hypothesis of appellant's guilt.  This evidence, when considered in connection with the evidence of appellant's threats against deceased's life, makes a complete chain of circumstantial evidence pointing unerringly to appellant's guilt.  State v. Millsap, supra.

WHITE, J.—An indictment was returned in the Circuit Court of Wright County charging the defendant with murder in the first degree in killing one Silas Moody, December 23, 1923.

On application of defendant a change of venue was awarded to Laclede County, where, September 11, 1925, he was found guilty and his punishment assessed at imprisonment in the penitentiary for life. Upon that verdict judgment was rendered and the defendant appealed.

One O. R. Millsap, also charged with the murder, was convicted as accessory before the fact, and on appeal the judgment against him was affirmed by this court. [State v. Millsap, 310 Mo. 500, 276 S. W. 625.] The evidence in this case, upon which conviction was had, points to the defendant as the person who actually killed Silas Moody.

On December 23, 1923, Moody was at home with his wife and baby and his wife's mother. Between eight and nine o'clock, while play-

ing with his baby, a load from a shotgun was fired through a window, the shot striking him in the neck and face. He fell, never regained consciousness, and died within a short time. His wife, Susie Moody, picked up the baby, handed it to her mother, seized a Winchester rifle, ran out of doors in her night clothes, barefooted, and fired two shots, although she did not see anybody. She gave utterance to some expletives while she ran, which indicated that she was ready to kill the murderer. Afterwards the defendant and Millsap were arrested, and Millsap tried and convicted, as stated.

I. The principal point upon which the appellant relies for reversal is that the evidence is insufficient to warrant submission of the case to the jury. While the evidence is practically the same in essential particulars as that held sufficient in the Millsap case, there are some features upon which the appellant places great stress, and we find it necessary to consider them at some length.

The night of the killing the ground was muddy and soft. The next morning it was frozen. The tracks of someone wearing overshoes were discovered near the window through which the shot came. Apparently the murderer stood with one foot advanced to within two or three feet of the window and the other foot drawn back as if standing sidewise to the window,—the usual position in firing a gun. As the tracks approached the spot they appeared as if the man had been walking. In going away he seemed to have been running: the tracks were further apart, they were deeper in the mud, and in one place the foot slipped in the mud. The window through which the shot was fired was on the south side of the house. The tracks passed around to the west side of the house and ran towards the woods in that direction.

In defense it was shown that several people were at the house soon after Moody was killed, and numerous people were there the next morning. Some came and stayed all night. One Moses Gray, constable, was one of the first to arrive. He testified that he told people to stay back, and he did the best he could to keep them back. There was no attempt to show that anyone walked on or marred the tracks that night. The evidence showed that the tracks were clear and distinct in the frozen ground next morning.

One Lonnie Gray testified that he lived a quarter of a mile from Silas Moody's house; that he had been hunting that day, and as he returned home between nine and ten o'clock he found a rubber overshoe in his yard, lying near his doorstep. Presently he was notified that Silas Moody was shot; he went to the house, remained there until morning, returned home and found the mate to the rubber shoe. He delivered both to the constable and there was evidence to show that they were kept by the officers until the trial. These

overshoes were taken, placed in the tracks around the Moody house, and fitted exactly. This is testified to by a number of witnesses. The sheriff later arrested the defendant and Millsap. Whether it was the same day, or later, the record does not show clearly. The defendant had on a pair of shoes which the sheriff took and retained, and those shoes were produced at the trial. The shoes and the overshoes were before the grand jury at the time the case was under consideration. The shoes, taken off the defendant, which some of the witnesses called "dress shoes," showed they had been worn with rubbers over them.

The rubber shoes found by Lonnie Gray had been worn upon shoes wider than the rubber shoes. The shoes taken off the defendant had the "Goodyear Wingfoot" rubber heels and Ponca soles. The imprint of such rubber heels was in the overshoes at the time the matter was before the grand jury. There was also a bent tack in one of the shoes, and a corresponding imprint in the overshoe. Several members of the grand jury returning the indictment, the sheriff, and several other witnesses testified to the comparison of the shoes and overshoes. All said that immediately after the murder the bent tack was in the shoe which apparently made the imprint in the overshoe; that the lettering in the rubber heels of the shoes was plainly to be seen, and the imprint of the letters was observable in the overshoes. The State further produced evidence to show that Walter Johnson, brother of the defendant Ernest Johnson, came to a store a day or two before the murder, with Ernest Johnson, and bought overshoes of the same size and kind as those produced in evidence. The defendant proved by the witness that rubber heels of that kind and shoes of that size were common in the community.

In order to show a motive for the crime the State introduced one McIntosh who lived at Coffeyville, Kansas. He testified that in 1923, in conversation with the defendant, the latter said no one had turned him in for making whiskey but Silas Moody, and if Moody ever crossed his path he would never tell on anybody else. It was practically the same evidence as that offered in the Millsap case on that point. The State introduced evidence of numerous threats against the life of Moody, made by the defendant, sometimes in company with Millsap and sometimes by himself. These threats extended from a year or two until within a few days before the murder. A few days before the killing Millsap and Johnson were together and one of them said he would just as lief shoot Moody as a dog, and the other said he would kill him like a rabbit. At another time defendant suggested that they all go hunting and surround Silas and all take a shot, and if they hit him no one would know which one it was. Again, at a party defendant told a friend that he had a gun which he desired the friend to keep until he started home. He said Silas

Moody was out in the sticks and if he ever crossed his path he was going to lay him out. Other threats of like character were put in evidence. The next morning after Moody was killed defendant said to a witness, "Did you hear the glad news? Silas Moody got killed last night. It was a damned fine thing." Some of those threats were couched in language that might mean nothing more than ill will. Others show expression of a real intention to kill. After the defendant and Millsap were taken to jail they told the sheriff that if he would let them out and give them five hundred dollars they would soon find the man who did the shooting.

It may be inferred that the reason why the murderer wore overshoes until he got away from the place and then threw them away was to prevent being tracked by bloodhounds. Bloodhounds are mentioned in some of the evidence, though they were not used.

This chain of circumstances sufficiently shows a motive, purpose as expressed in the threats, and an opportunity to commit the crime. The very positive connection of the overshoes with the shoes which the defendant wore, and lack of evidence to break the logical connection of the defendant with the overshoes, make it a matter for the jury to say whether the defendant was the one who fired the fatal shot. That the man who made the overshoe tracks was the one who fired the shot seems reasonably certain, and the overshoes found probably were worn by the murderer. It seems fairly probable that the defendant wore the overshoes, and the connection between his shoes and the overshoes is a circumstance from which the jury might connect him with the murder.

The defendant offered evidence of an alibi to prove that he was at the home of his brother—Walter Johnson—that night and this is testified to by persons who passed there in a car. The State in rebuttal offered evidence to show that the road, which this car was said to have traveled, was muddy and impassable for a car on that day, so that the occupants of the car must have been mistaken as to the date. Also, the State offered evidence tending to impeach some of the alibi witnesses.

II. The defendant lays great emphasis upon circumstances which he claims relieve him from the effect of the circumstantial evidence. Lonnie Gray was a cousin of Mrs. Susie Moody. She was twenty-three years of age. Her husband was forty-five or fifty. Lonnie was a bachelor and lived alone a quarter of a mile away. It was shown that, at some recent time previous to the killing, Lonnie had lived at another place in the house with the Moodys for a few days. Soon after that Susie Moody parted from her husband for awhile. Nothing further is shown on that point to indicate any estrangement on account of Lonnie Gray or any ill feeling between Lonnie Gray and

Silas Moody.    Gray testified to finding the overshoes.    He said he was out hunting on the day of the murder, that he became exasperated with his gun because it would not shoot and whipped it around a tree or fence post and threw it away.    He said that was done before Silas Moody was shot; but he was not very certain about that.    He also said that when he got home that night he found that some 12-gauge shells which he had bought that day or the day before, were gone.    They were factory shells.    Possibly he meant to intimate that Johnson, the defendant, got those shells.    Some of the parties who arrived after the shooting picked up some of the wadding which came with the fatal shot and was on the floor at the Moody house. This wadding showed the shell fired was not a factory made shell, but a reloading shell.    It was shown that Silas Moody had a reloading outfit by which he reloaded the shells after they had been fired, and had some reloading shells in the house at the time.    It was also shown that Lonnie Gray, a short time before, had come to Silas Moody's house to borrow some shells.    This evidence goes no further than this attempt to arouse suspicion that Lonnie Gray borrowed shells from Moody and shot Moody with one of them.    There was no attempt to connect Lonnie's foot with the tracks or the overshoes that were found.

Lonnie Gray's testimony shows that he was quite an ignorant man; some plain questions he did not answer at all, apparently because he did not understand them.    It looks rather unreasonable, if he had committed the murder and desired to hide the gun with which it was done, that he should have whipped it around a tree.    Hiding evidence of a crime does not usually take that violent form.    It looks more as if it were the rage of a foolish man.

The attempt to throw suspicion on Lonnie Gray is not of sufficient force to destroy the effect of the circumstances detailed above, and while such evidence might discredit the testimony of Lonnie Gray, it was for the jury to say whether he really found the overshoes in the manner he testified to.

III.    Another point upon which the defendant lays stress is that when the overshoes were produced at the trial they did not show the imprint of the shoe heel plainly, as the witness had sworn at the time of the comparison.    Also the shoe did not contain the bent tack, nor any hole where the tack had been, and the imprint made in the overshoe made by the tack was much dimmer.    Nearly two years had elapsed between the arrest of the defendant and the trial.    The overshoes and shoes had been handled at previous trials, preliminaries, and had been in the hands of a number of officers.    They were marked at the time they were before the grand jury and those marks were still on them.    Lonnie Gray was so mixed in his testimony that he could not say whether the overshoes exhibited at the time of the

trial were the ones he found. Several witnesses before the grand jury testified they thought the overshoes were the same, but they appeared to have been worn. They were changed very much from the time when they were before the grand jury.

The argument is that because these shoes and overshoes are not clearly shown to be the shoes and overshoes compared by the grand jury, therefore the case is not made out.

A complete answer to that is this: if the shoes and overshoes were found by the witnesses to match up and possess the marks to connect them with the murderer at the time they were first examined and at the time they were before the grand jury, it would not matter whether they were introduced at the trial at all. It was the connection of the defendant's shoes with the overshoes which evidently made the tracks of the murderer, that counted, and if that connection and the relation of one to the other was sufficiently established by the witnesses at the time they examined them and compared them, it does not matter what happened afterwards to change their character.

So we conclude that while the evidence is entirely circumstantial, and while it is not as cogent and conclusive as it might be, we think it was sufficient to submit the case to the jury. We have only the cold record. The circumstances, the atmosphere of the case, the appearance of the witnesses—in general, the surroundings—are absent. The trial court had this matter before it a number of times and has always found the evidence sufficient to make a submissible case. It was for the jury to say whether the recollection of the witnesses as to the comparison of the shoes and overshoes was worthy of credence at the time of the trial. The ruling in the Millsap case is authoritative.

Other errors are assigned which have been fully answered in the Millsap case.

The judgment accordingly is affirmed. All concur.