**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Gary Wayne KLEYPAS,
Defendant-Appellant.**

No. 10838.

Missouri Court of Appeals,
Southern District,
Division Two.

July 10, 1980.

Motion for Rehearing or for Transfer
Denied July 30, 1980.

Application to Transfer Denied
Sept. 9, 1980.

Devon F. Sherwood, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Lisa M. Camel, Edward F. Downey, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Judge.

The 21 year old defendant was charged with having committed a capital murder on January 23 or 24, 1977. He entered a plea of not guilty and gave notice of his intent to rely upon the defense of mental disease or defect. He was permitted to waive trial by jury. While the defendant introduced evidence tending to establish the same, the trial court found that the evidence did not establish mental disease or defect excluding responsibility. The trial court further

found the defendant's actions in killing the victim were the result of prolonged and excessive use of drugs coupled with excessive consumption of alcohol the night in question. The defendant was found guilty of second degree murder. The trial court, mercifully expressing a hope of rehabilitation, sentenced the defendant to 30 years' imprisonment. The defendant appeals. The sufficiency of the evidence is not in question. Only a brief summary of the facts is required to cast the background of the two points of error asserted by the defendant.

The 78 year old victim lived alone in her home. She was known to have been alive on the evening of January 23, 1977. At approximately 8:00 a. m. on January 24, 1977, her body was discovered by her daughter. The sheriff was called and arrived within a few minutes. After an investigation in the home, the sheriff turned his attention to the footprints in the fresh snow leading to and going away from the back door of the victim's home. These were the only footprints leading to and going away from the home. The footprints had been made by boots which left a distinctive track in the snow. The defendant lived with his parents a short distance from the home of the victim. When the parents retired at approximately 11:00 p.m. on the 23rd, the defendant was writing a letter. He was drinking orange juice which, unknown to them, was mixed with vodka. The defendant testified and stated that although he awoke in the morning in his bed, he did not recall going to bed that night. The footprints led from the back door of the home of the defendant to the home of the victim and from the home of the victim to the back door of the home of the defendant. The stride of the footprints coming to the home of the victim was 30 inches, while the stride of the footprints going from the home of the victim was 60 inches. The sheriff followed these footprints to the back door of the home of the defendant. Along the route, he found a vodka bottle in the disturbed snow containing only a trace of vodka. The defendant admitted the vodka bottle was his.

The details of what happened at the home of the defendant are the subject of a conflict in the evidence. The sheriff did enter that home and took into his possession a pair of the defendant's boots. The configuration on the soles of these boots was shown to match the tracks in the snow. The defendant's first point is that the court erred in admitting these boots in evidence. He further contends that without these boots the sheriff had no probable cause to arrest defendant. Therefore, he continues, the court also erred in not suppressing as the fruit of the poisoned tree, evidence of the defendant's hair samples and dental impressions taken from him after he was arrested and placed in county jail. The defendant's hair samples were shown to match hair samples taken from the victim's body. The "bite test", based upon the defendant's dental impressions, is the subject of the defendant's second point of error and will be later discussed.

It is conceded that when the sheriff arrived at the back door of the defendant's home he knocked. The defendant's mother answered that knock. She testified that when she saw the vodka bottle he was carrying in his hand, she asked what the trouble was and the sheriff replied that he had found a bottle on the railroad tracks. The sheriff then asked if her husband was at home. She replied: "I said that my husband was in a wheel chair and he asked if there was any other person there and I said that [defendant] was there, and I told him I would go get [defendant], and my husband had come into the kitchen by then and the sheriff came in when I went to call [defendant]". She further testified that when she turned to call the defendant, the sheriff, without invitation, entered the kitchen. At that point the defendant had also entered the kitchen. The sheriff then asked the defendant if he had any boots and if he could see them, to which he replied, "Sure". Defendant then turned and went to his bedroom, followed by the sheriff. The defendant and his parents testified the sheriff also went into the bedroom and later reappeared carrying the vodka

bottle and the defendant's boots. The defendant testified he first showed the sheriff a pair of cowboy boots and the sheriff asked "if I had any other boots". The defendant said he then picked up the boots in question and the sheriff grabbed them from him. On the other hand, the sheriff testified that when the mother answered the door, he identified himself and told her he was concerned about the footprints coming from and to her residence; he then asked if her husband was at home and she replied that he was and she told him he could come in and talk to her husband and opened the door for him. The sheriff then stepped in and saw the husband had one leg amputated and was in a wheel chair. He then asked if any other males lived at the residence and was told the defendant did. About that time the sheriff looked up and saw the defendant standing in a doorway. The sheriff was acquainted with the defendant and asked him if he wore boots. The defendant replied that he did and in response to the sheriff's question, further replied that the sheriff could look at them. Then the defendant went into his bedroom and handed the sheriff, who was standing just outside the door, a pair of cowboy boots. The sheriff then asked if he had other boots and the defendant picked up the boots in question and handed them to the sheriff. The sheriff noticed the boots were damp and he examined the soles and determined they were compatible with the footprints in the snow. At that point the sheriff asked the defendant to go with him to the office, which the defendant did. Upon arriving at the office, the sheriff formally arrested the defendant and placed him in the county jail.

The defendant does not contend that the sheriff, upon seeing the boots that constituted material evidence, could not seize that evidence. *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978), cert. den. 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). He does contend the manner in which those boots came into view constituted an unreasonable search and seizure condemned by the Fourth Amendment to the Constitution of the United States and § 10 and § 15 of Article I of the Constitution of Missouri.

Without deciding that the preliminary action of the sheriff constituted a search or a seizure, see *State v. Howell*, 524 S.W.2d 11 (Mo. banc 1975); *Deckard v. State*, 456 S.W.2d 35 (Mo.1970), the defendant's contention will be determined on that basis. The defendant acknowledges that a voluntary consensual search and seizure is not condemned by the cited constitutional provisions. However, he contends the state did not establish a search and seizure by voluntary consent, but only acquiescence to the authority of a law enforcement officer citing *Bumper v. North Carolina*, 391 U.S. 453, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) and *Commonwealth v. Dixon*, 226 Pa.Super. 569, 323 A.2d 55 (1974). He also contends a voluntary consent is not established because the sheriff did not advise the defendant and his parents he was investigating a homicide and of the right to refuse him entry and the right to refuse to produce the boots. He goes on to contend that even if there was a voluntary consent for the sheriff to enter the house, there was none for him to enter the defendant's bedroom.

 Whether or not there was a voluntary consent is to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Rush*, 497 S.W.2d 213 (Mo.App.1973). That consent may be implied as well as express. *United States v. Turbyfill*, 525 F.2d 57 (8th Cir. 1975); *State v. Berry*, 526 S.W.2d 92 (Mo. App.1975). That determination is dependent on "many factors including but not limited to the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in police custody, whether there was any fraud or misleading on the part of the officers, and the evidence as to what was said and done by the person consenting." *State v. Rush*, supra, 497 S.W.2d at 215. Where there is a conflict in the testimony, it is the function of the trial court to determine the credibility of the witnesses and resolve such conflicts. *State v. Sayles*, 579 S.W.2d 748 (Mo. App.1979). The testimony of the sheriff,

which the trial court was entitled to believe, established that he did ask and was granted permission to enter the home. It established that he asked to see the boots in question and they were handed to him. The sheriff was alone. He made no threats. Even according to the defendant and his parents, the language of the sheriff was precatory. The consents to the sheriff's requests were expressly and freely given. These factors and others distinguish this case from *State v. Witherspoon*, 460 S.W.2d 281 (Mo.1970). See *State v. Pruitt*, 479 S.W.2d 785 (Mo.banc 1972); *State v. Rush*, supra. There is no evidence that the sheriff acted in such a manner that the responses of the defendant and his parents to his requests can reasonably be deemed to be an acquiescence in his exercise of authority. It is true that he did not state that he was investigating a homicide. However, neither by citation or logic does the defendant establish how such failure causes an otherwise voluntary consent to be involuntary. The voluntariness of their responses does not depend upon them having been so informed. Compare *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Such failure is to be distinguished from a fraudulent misrepresentation or trickery or misrepresentation of authority as in *Bumper v. North Carolina*, supra. The fact the sheriff did not advise defendant and his parents of their right to refuse his requests is not alone determinative, but is one factor to be considered in the totality of the circumstances. *United States v. Mendenhall*, supra; *Schneckloth v. Bustamonte*, supra; *State v. Rush*, supra. The sheriff testified he did not enter the bedroom. However, even if he did, that is not decisive, as consent for him to do so is readily implied from the defendant's willingness for the sheriff to see his boots and his subsequent actions. At the hearing to suppress the defendant explicitly stated the sheriff grabbed the boots in question. The voluntary consent of the defendant could be found to have been demonstrated by the following question and his apparently unexpected answer during direct examination: "Q. And did you hand Sheriff Barnes that pair of boots? A. Yes." Emphasis was added by the following question and his answer: "Q. Did you do that, Gary? A. Well, no when I came up with them he stuck his hand out to go for them and he just took them. He took them from me." The trial court did not err in finding the sheriff acquired the boots as a result of voluntary consent and in admitting the same in evidence. Upon the sheriff seeing and examining the boots in question, he clearly had probable cause to arrest the defendant, *State v. Abbott*, 571 S.W.2d 809 (Mo.App.1978), and the balance of the defendant's argument under his first point therefore fails.

The defendant's second point concerns testimony relative to the source of the bite marks on the victim's body. Photographs were taken of these bite marks. Under the direction of the physician who performed the autopsy, the tissue containing two bite marks was dissected and preserved. Under the direction of Dr. Ronald Gier, D.D.S., photographs were made of the defendant's teeth and by means of dental impressions, models were made of his upper and lower teeth, or his bite. In the photographs of the bite marks and teeth, a ruler was superimposed for purposes of comparison. The photographs of the bite marks and tissue containing the bite marks and the photographs of the defendant's teeth and models of his bite were submitted to Dr. Gier for his examination and comparison.

Dr. Gier was Chairman of the Dental Department of the University of Missouri at Kansas City. He received his degree as a Doctor of Dental Surgery at Washington University in St. Louis. He served two years as a dentist in the U. S. Navy and then engaged in private practice. He subsequently attended graduate school at the University of Indiana for training in oral diagnosis and oral medicine. He completed a postgraduate course at the Hall of Fame Institute of Pathology in Washington, D. C. That institute was described as being "the mecca of pathology of dentistry and other types of pathology". He had read numerous texts and articles concerning identifica-

tion by teeth and teeth marks. He estimated that he had read 40 or 50 articles in dental journals regarding forensic dentistry. He attended a postgraduate course sponsored by the American Academy of Odontology. He had a fellowship in the American Academy of Oral Pathology. Membership in that academy is attained by examination and is limited to approximately 300 dentists out of an approximate potential of 100,000 dentists. For approximately 8 or 9 years Dr. Gier had taught classes in forensic odontology. He had done three body identifications by means of dental remains.

On direct examination, after stating his qualifications, Dr. Gier described in detail the methods he used for his examination and comparison. He described the distinct characteristics of the defendant's teeth. When Dr. Gier was asked what he found as a result of his examination of the tissue, the defendant objected on the basis of inadequate identification of the tissue and the qualifications of Dr. Gier to make a comparison of the exhibits and to reach any conclusion that would be substantial evidence. The defendant was granted a continuing objection on that basis. Thereafter, Dr. Gier testified on direct that the bite marks on the body "were compatible with the impression of the occlusion and the diagnostic cast and could have been made by these teeth" and that the bite marks were "consistent with marks made by the mouth of the defendant".

Then, upon cross-examination, Dr. Gier was asked: "You aren't telling us that it is your opinion that the defendant made the bite marks, are you?" He answered: "It's my opinion that within a reasonable scientific certainty that the bite marks were made by the defendant." Thereafter, counsel for the defendant developed the opinion of Dr. Gier that statistics relative to the number of people with very similar bite marks had not been accepted by the forensic dental field; but, he added the number would be very, very low. The defendant then moved to strike the entire testimony of Dr. Gier for the reason that it had not been shown there was a recognized science

with regard to bite marks. The motion was overruled. The defendant's second point is that the trial court erred in overruling the motion to strike.

In support of that point the defendant cites the rule concerning the acceptance of scientific tests as set forth in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013, 1014 (1923). *Frye* announces: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." While this rule has been criticized, McCormick on Evidence § 203, p. 488, it is the standard that has been to this date accepted in Missouri, *State v. Sager*, 600 S.W.2d 541 (Mo. App.1980); *State v. Stout*, 478 S.W.2d 368 (Mo.1972). Also see *State v. Biddle*, 599 S.W.2d 182 (Mo. banc 1980). The defendant contends the science of identification by bite marks has not reached the standard required by that rule. On the other hand, the state contends that the science of forensic odontology has reached that standard citing such cases as *State v. Peoples*, 227 Kan. 127, 605 P.2d 135 (1980); *State v. Routh*, 30 Or.App. 901, 568 P.2d 704 (1977); *People v. Milone*, 43 Ill.App.3d 385, 2 Ill.Dec. 63, 356 N.E.2d 1350 (1976); *People v. Marx*, 54 Cal.App.3d 100, 126 Cal.Rptr. 350 (1975). After the briefs were submitted in this case, upon a most comprehensive review of the state of the science of forensic odontology in a remarkably well reasoned opinion, the Missouri Court of Appeals, Western District, approved forensic odontology as a means of positive identification of an individual. *State v. Sager*, supra. That case, however, is pending upon a motion to transfer to the Supreme Court. However, under the circumstances of this case, its resolution is not dependent upon

the approval or rejection of forensic odontology as a means of positive identification of an individual.

The problem involved in this case is not really unique. It is the identification of the perpetrator of a crime by a comparison of marks or traces connected with the crime with the physical characteristics of the defendant or an object associated with the defendant. A scientific principle or discovery may or may not be involved in such a comparison. It may be involved in one or both of two aspects. The first concerns the means and technique used in making a comparison to determine the existence of similarities or dissimilarities. This aspect is of concern when the comparison is made by a scientific process such as neutron activation analysis, in which event the means and techniques used must meet the required standard. *State v. Stout*, supra; *State v. Stevens*, 467 S.W.2d 10 (Mo.1971); *State v. Jackson*, 566 S.W.2d 227 (Mo.App.1978). But, a comparison may not involve such an esoteric process. A comparison is involved in an observation that a footprint matched or could have been made by a defendant's shoe.

The second aspect of identification by comparison in which a scientific principle may be involved is a determination of whether or not the established points of similarity (used in the sense of being the same) are so unique that it may be said, within a required degree of certainty, the mark or trace was made by a specific person or by a specific object. This in turn may depend upon the state of the science of statistics in the field in question. The statistical science as applied to the points of similarity may produce varying degrees of probability. A varying number of points of similarity may lead to different degrees of certainty of identification. One point of similarity may be so remarkable the result is certainty of identification. One point of dissimilarity may eliminate a connection of a mark or trace with a defendant. In some circumstances the similarities may establish a high degree of probability in the absence of statistics. For example, an opinion concerning the source of cloth fibers may be supported by competent evidence in the absence of statistical data. *State v. Maxie*, 513 S.W.2d 338 (Mo.1974). For this decision it is not necessary to explore in depth the range of probabilities that may be expressed by a witness and the extent to which an expression of a degree of probability must be supported by statistics. See McCormick on Evidence § 204, p. 491. Those questions are crucial when, over objection, a witness is permitted to express a degree of probability, or when the sufficiency of the evidence to support a conviction is dependent upon the degree of certainty established.

■ However, for the purpose of admissibility, it is not required that points of similarity, through statistics or otherwise, constitute a basis upon which a witness can state the marks or traces were left by the defendant. So long as the mark or trace is not so common as to lack relevance, evidence that a mark or trace could have been left by the defendant is admissible. "Circumstantial evidence may have a material relevance even though it does not exclude every adverse possibility." *State v. Fields*, 434 S.W.2d 507, 516 (Mo.1968). Thus, it may be shown the defendant's shoe could have made a footprint, *State v. McGlathery*, 412 S.W.2d 445 (Mo.1967); *State v. Johnson*, 316 Mo. 104, 289 S.W. 789 (1926); or that his automobile could have made a tire track, *State v. Robinson*, 106 S.W.2d 425 (Mo. 1937). The rule has been applied in approving evidence that a microscopic examination revealed that hair could have come from the head of the defendant. *United States v. Cyphers*, 553 F.2d 1064 (7th Cir. 1977); *United States v. Haskins*, 536 F.2d 775 (8th Cir. 1976). The principle has been applied in approving evidence that brick dust on the defendant's clothing was similar to that at the scene of the crime, *State v. Williams*, 382 S.W.2d 597 (Mo.1964) or that a roll of dimes was wrapped in the same color paper as a missing roll. *State v. Hampton*, 275 S.W.2d 356 (Mo. banc 1955).

■ Identification by bite marks is similar to identification by footprints or finger-

prints. "There is no intermediate mechanical stage in which reliability may be questioned." *People v. Milone*, supra, 2 Ill.Dec. at 71, 356 N.E.2d at 1358. Dr. Gier testified to several unique points of similarity between the bite marks and the defendant's bite. He was clearly qualified to make this comparison. *State v. Phillips*, 511 S.W.2d 841 (Mo.1974). Because of the nature of the comparison examination his expert findings were of aid to the court and properly admitted. *State v. Khajehnouri*, 572 S.W.2d 238 (Mo.App.1978). His conclusion that the bite marks were compatible with or could have been made by the defendant's bite was relevant and was admissible.

It was only when on cross-examination Dr. Gier stated that with reasonable medical certainty the bite marks in question had been made by the defendant, did the statistical aspect of the state of the science of forensic odontology become critical. Even assuming that, under the circumstances, the subsequent motion to strike the reasonable medical certainty testimony should have been sustained, the trial court did not err in overruling the defendant's motion. That motion was to strike all of Dr. Gier's testimony, which included clearly admissible evidence. The court "was not required to review all of the testimony of the witness and strike out the portions, if any, that were incompetent." *State v. Gilpin*, 320 S.W.2d 498, 504 (Mo.1959). In all events, in its careful and explicit findings of fact, the trial court clearly indicated that it considered only the testimony that the bite marks were consistent and compatible with the defendant's teeth. The defendant could not have been prejudiced by the testimony last referred to. Excluding the evidence of reasonable medical certainty, the evidence was clearly sufficient to support the conviction. The judgment is affirmed.

BILLINGS, P. J., and PREWITT, J., concur.