**STATE of Missouri, Respondent,**

v.

**Daniel O. JONES, Appellant.**

**No. WD 40793.**

Missouri Court of Appeals,
Western District.

Aug. 29, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 3, 1989.

Charles Brown, Taylor Fields, Kansas City, for appellant.

William L. Webster, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SHANGLER, P.J., and TURNAGE and KENNEDY, JJ.

TURNAGE, Judge.

Daniel O. Jones was found guilty of forcible rape, § 566.030, RSMo 1986, by a jury and the court sentenced Jones to ten years imprisonment pursuant to the jury's verdict. Jones contends there was error in admitting expert evidence relating to hair, in cross-examination of Jones, and in failing to quash the jury panel. Affirmed.

May 20, 1987, was the last day of school for seniors at Raytown South High School. At about 10:30 a.m. on that day, the victim, a teacher, entered a class room to prepare for a class which was to begin in a few minutes. The victim rearranged the desks, and because the room did not have any windows, she opened double doors which led on to the stage of a theater. She stated as she opened the doors a hand reached out from behind the doors, grabbed her, and pulled her on to the stage. The stage was dark, but there was some light, and after the victim's eyes adjusted to the light, she was able to observe her attacker. She described him as a black male wearing bluejeans and a light colored T-shirt.

The victim stated her attacker threw her to the floor on to her back, threatened to kill her, and proceeded to rape her.

After about fifteen minutes the victim was able to free herself and ran into her classroom screaming. Her screams attracted a number of people and the stage and auditorium were searched soon thereafter. It was discovered that there were two unlocked steel doors, which led to the outside, and apparently these were open and were the source of light on the stage. All of the other doors were locked, except doors which led to the interior of the school.

There was evidence that a teacher was in a classroom which faced the doors leading to the exterior. She did not observe anyone leave the auditorium by those doors until Coach Lathrop came out, as a part of his search of the auditorium.

A student testified that while he was walking in a hall inside the school he observed Jones coming out of the auditorium. This occurred at about the same time as the victim was screaming.

The victim gave a description of the man who had raped her to the police officers. One of the officers gave her a school yearbook to determine if she could identify anyone. From this book she identified Jones who was a senior at the time of the rape.

Jones was arrested, placed in a lineup, and the victim identified Jones from a video tape of the lineup. During the trial the victim also identified Jones in the court room as her attacker.

The victim went to Research Hospital where she was examined and her pubic hairs were combed. This produced an unknown hair. Jones was arrested and hair samples were taken from his pubic area.

John Wilson, from the Regional Crime Laboratory, testified that he had examined many thousands of hairs, and had lectured and written extensively on the subject of hair identification. He stated that he had compared the hair found on the victim with a hair taken from Jones and found the two to be indistinguishable. Wilson further testified that both the hair found on the victim and the sample taken from Jones contained a number of big black spots in the cortex, which he referred to as voids. Wilson testified that these voids were not common and in his experience he had only found this condition in one or two percent of the hairs he had examined. Wilson did not testify that the hair found on the victim came from Jones.

Jones testified and admitted that he was in the auditorium at the time of the rape, but was asleep on the steps leading from the stage to the auditorium. He said that he awoke when he heard a woman screaming and immediately ran from the auditorium because he was afraid he would get into trouble with the school administration since he was not supposed to be in the auditorium at that time. Jones admitted that he had told the police five or six different versions of what he had been doing just prior to, and during, the time the rape took place.

Jones produced an expert on hair identification who stated that he found some common features between the hair taken from the victim and those taken from Jones, but testified that he could not say the hairs were indistinguishable. He found several dissimilarities and also stated he did not observe the black spots which Wilson had found. Jones also produced evidence of his good character.

■ Jones first contends that the court erred in admitting Wilson's testimony that Wilson had only found black spots in one or two percent of the hairs which he had examined. The contention is that this testimony did not meet the test set out in *Frye v. United States*, 293 F. 1013 (DC Cir.1923). Jones contends Wilson's observation of the black spots was not recognized by the scientific community as a basis of identifying hair, thus the testimony of Wilson concerning this aspect of his comparison was inadmissible.

This argument mischaracterizes the testimony of Wilson by stating that Wilson gave an opinion of probabilities of the unknown hair found on the victim as coming from Jones, when Wilson did not testify to that fact. Wilson did not testify in terms of a percentage of probabilities of the hair found on the victim as coming from Jones, but only testified as to his observation of hairs in his own experience. There is no contention as to Wilson's being a qualified expert, nor to his extensive experience in examination of hair, thus it was proper to allow Wilson to testify to what, in his experience, he had observed.

Evidence of hair comparisons is accepted in Missouri. *State v. Hoard*, 715 S.W.2d 321, 325[6, 7] (Mo.App.1986). Jones relies on *State v. Kleypas*, 602 S.W.2d 863 (Mo. App.1980). There the court discussed statistical science as applied to the points of similarity between items being compared and the application of such information to produce varying degrees of probability. *Id.* at 869. The probability referred to is that the items examined match a known item. That case is not applicable here because, as noted, Wilson did not testify to any probability, or percentage of probability, that the hair came from Jones. There was no error in admitting Wilson's testimony concerning the existence of voids in the cortex of the hairs compared.

■ Jones next contends the court erred in allowing the State to cross-examine Jones concerning Jones' specific acts of conduct at Raytown South. After Jones had testified on direct that he ran from the auditorium when he heard a woman scream because he was afraid he would get into trouble for being in the auditorium, the State cross-examined him on the fact that he had been in trouble at school for disruptive behavior, excessive tardiness, and

roaming the halls without passes. The cross-examination sought to elicit from Jones the fact that fear of violating school rules had not kept him from violating those rules in the past and, therefore, he would have had no fear of being in the auditorium when he was not supposed to be. Thus, running from the auditorium was not attributed to being afraid of getting into trouble for violating school rules.

Jones contends that the cross-examination violated the rule stated in *State v. Earvin*, 510 S.W.2d 419, 422[2] (Mo.1974), in that evidence of good reputation for peaceful behavior may not be countered by proof of specific acts of misbehavior. Jones also relies on *State v. Milligan*, 654 S.W.2d 204 (Mo.App.1983), in which this court found that evidence that the defendant became violent when drinking was prejudicial.

As pointed out above, the cross-examination was not designed to rebut evidence of Jones' good reputation, but was designed to discredit his explanation for running from the auditorium after the rape.

Further, *Milligan* involved evidence which was designed to show violent and mean conduct on the part of the defendant. This court found the purpose was to convince the jury that the defendant was capable of committing the violent crime for which he was on trial. The evidence of misconduct by Jones at school would have no relation to whether or not he committed the rape.

The cross-examination here was proper.

Jones further contends that the court erred in failing to quash the jury panel after the State had exercised its peremptory challenges to remove two of the three black veniremen. One black person served on the jury.

After Jones objected to the use of the State's strikes, the State explained that it had stricken the two blacks because they both had relatives serving time in the penitentiary. The State explained that it had stricken all persons, black and white, who had relatives serving time in the penitentiary. Jones contends that the State left one person on the jury who had a friend in the penitentiary. The State explained that that person was left on because she was a retired state employee, had an uncle on the Kansas City police force, and her mother has been assaulted and robbed, all of which made her a desirable juror from the State's standpoint.

The court found that the State had not exercised its strikes in such a manner as to discriminate against blacks. This court is required to find that ruling to be clearly erroneous in order to reverse. *State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987). The State gave a race neutral explanation for its strikes. A review of the record does not show the ruling to be clearly erroneous.

The judgment is affirmed.

All concur.