THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD MILONE, Defendant-Appellant.

Second District (1st Division)    No. 73-436

Opinion filed November 12, 1976.

386

John T. Perry, of Wheaton, and William J. Martin, of Chicago, for appellant.

John J. Bowman, State's Attorney, of Wheaton (Edward N. Morris, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE HALLETT delivered the opinion of the court:

On a bench trial, the defendant was convicted of murdering Sally Kandel and sentenced to 90 to 175 years in the penitentiary. On appeal, he contends, in substance: (1) that photographs of his mouth and impressions of his upper and lower teeth, taken pursuant to a search warrant, were seized in violation of his constitutional rights and that the trial court therefore erred in denying his motion to suppress such evidence; (2) that the so-called "Bite-Mark" identification evidence was not proven to be sufficiently reliable to permit its admission into evidence and that the admission of such evidence over his objection therefore constituted reversible error and deprived him of a fair trial; and (3) that the prosecution's circumstantial case was consistent with his innocence and that the evidence was therefore insufficient to establish his guilt beyond a reasonable doubt. We do not agree with any of these contentions and therefore affirm the judgment.

At 5:15 p.m. on the evening of September 12, 1972, 14-year-old Sally Kandel ate dinner at her home in Carol Stream, and at 6:10 p.m. left for a bicycle ride, promising to be home by 7 p.m. She never returned. Her

absence was reported to the police at 10 p.m. that evening and at 2 a.m. the next morning Sally's stepfather identified her bicycle which was found along the side of Lies Road, a country road in a rural area about 2 miles from the Kandel residence. At 5:50 a.m. the police discovered Sally Kandel's body lying in the mud between two rows of corn approximately 200 feet from where her bicycle was found earlier. Her blue jeans and body shirt were torn and there were numerous lacerations in the back of her head.

The body was in a state of extreme rigor mortis and was placed in a morgue bag and taken by ambulance to the funeral home. An autopsy was performed by Dr. R. N. Horowitz of Central Du Page Hospital who listed the cause of death as severe head injuries, comminuted skull fracture, and laceration of the brain. Dr. Horowitz noted multiple lacerations of the scalp concentrated in the back part of the head on the right side. There was a traumatic amputation of the victim's left thumb, and the upper portion of the ring and middle finger on the left hand were fractured. The injuries to the hands occurred at the time of death and appeared to be the result of the victim's attempt to protect herself from blows being delivered to her head.

Dr. Horowitz further noticed two lacerations, one in the eyelid of each eye, which had been carved after death with a sharp instrument, and which "were symmetrically placed in an area where they would have been deliberate, which meant that they were planned as opposed to an accidental cut." In addition, he observed a human bite mark on the inner aspect of the victim's right thigh which had been inflicted sometime after her heart had stopped beating. He examined the contents of the victim's stomach and concluded that death occurred within one to two hours of her dinner at 5:15 p.m. the evening of the murder.

Douglas Miller of the Du Page County Sheriff's Office testified that after discovering the body he found a bar type instrument, later identified as a Jewel shopping cart handle, in tall grass approximately 16 feet away from the body. A chemist examined this handle and found traces of human blood, and hair which was consistent in color and character with the hair of the victim. Examination of the lacerations and bruises on the body led to the determination that this shopping cart handle was in fact the murder weapon. After pictures of the handle were circulated in newspapers and on television, the owner of the D-C Warehouse in Addison, Illinois, notified the authorities that a handle similar to the one in question was missing from one of the shopping carts used to transport inventory in his warehouse. The police focused their investigation on employees of the D-C Warehouse when the murder weapon was positively matched to one of the carts there.

On September 22, Detective Ley of the Du Page County Sheriff's

Office conducted interviews with a number of employees of the D-C Warehouse and at that time spoke to the defendant. The defendant stated that he remembered seeing the handle under a counter in the warehouse, but he had no idea when or how it had been removed from the premises. He also stated that he left work around 5:30 or 6 p.m. on the evening of the murder, but five days later he told Detective Ley that he had worked until 7:30 or 8 p.m. that evening and he was sure he had not left the warehouse during the afternoon or evening.

Co-workers James Twomey, John Francioni, and Bernard Swartz all gave statements to Detective Ley and later testified at the defendant's trial. When the defendant was confronted with these statements, he admitted to Ley that he had removed the shopping cart handle from the warehouse and had carried it around in his car for protection. He maintained, however, that he threw the handle away at a park in Lombard two days prior to the killing. He also admitted leaving the warehouse on the evening of September 12 for about an hour and a half, and stated that he ate dinner at a restaurant in Addison, and then drove around a shopping center for awhile.

On January 24, 1973, a search warrant was issued to obtain photographs and dental impressions of the defendant's teeth and mouth. On January 25, he was arrested and taken to a dental office in Wheaton where the photographs were taken and the impressions made. After a comparison between the dentition of the defendant and a silicone impression and photographs of the bite mark found on the victim's thigh, the defendant was formally charged with the murder of Sally Kandel.

At the trial, Bernard Swartz testified that he was the sales manager of the D-C Warehouse, and that on August 30 or August 31, 1972, he observed the defendant placing the shopping cart handle in the trunk of his car. The defendant told Swartz that he needed the handle "for security or protection." John Francioni and James Twomey, co-workers of the defendant, testified that they observed the handle in the front seat of the defendant's car on numerous occasions prior to September 10, 1972, two days before the murder. They both saw the defendant carry the handle into a park on September 10 to use as a weapon, but they could neither confirm nor deny the defendant's contention that he had thrown the handle away that evening.

Francioni stated that while working at the warehouse shortly before 6 p.m. on the evening of the murder he gave the defendant $5 to pick up a sandwich for him. He did not see the defendant again until he punched out at 7:21 p.m. that evening. Twomey stated that when he returned to the warehouse from dinner at 6 p.m. that evening, the defendant's car was not in the lot. He observed the defendant drive into the lot around 7:20 p.m. and noticed that the defendant was wearing a different shirt than he had

been wearing earlier in the day. He observed the defendant's clean shirt and combed hair and accused him of going home and getting "cleaned up" when he should have been helping them work. When Francioni inquired about his sandwich, the defendant said he was unable to stop for food because he was busy eluding the Addison police who had spotted and chased him because they knew he was driving with a revoked driver's license. At the trial, the defendant stipulated that no such chase had in fact occurred.

Nine-year-old Linda Roseboom testified that she lived in a farmhouse next to the cornfield where the body was found, and that between 6 p.m. and 7 p.m. on the evening of the murder she observed a light colored car with front end damage on the driver's side pull into her driveway and turn around. She also noticed that the driver was a white male with very long sideburns. The record indicates that on the evening of the murder the defendant wore his sideburns quite long and drive a beige 1964 Dodge which had a damaged front end on the driver's side. An examination of this car failed to turn up any evidence of the crime but the front seat and carpet had been scrubbed with soap and water shortly before the sheriff's police examined it.

The State presented extensive dental testimony to establish a correlation between the bite mark on the victim's thigh and the dentition of the defendant, while the defendant offered testimony to refute this contention. The defendant did not testify in his own behalf. The court found the defendant guilty of murder and sentenced him to 90-175 years.

The defendant's first main contention is that the pictures of his mouth and the impressions made of his upper and lower teeth, pursuant to a search warrant, were seized in violation of his constitutional rights and that the trial court therefore erred in denying his motion to suppress such evidence.

His first argument is that there was an absence of "probable cause" for the search warrant to issue and says that the affidavits are "so devoid of facts and replete with conclusions that it was impossible for the issuing magistrate to form an independent judgment as to the existence of probable cause."

■■ A review of the record shows that the judge was allowed, on the basis of the four affidavits, to determine for himself the persuasiveness of facts relied upon by the affiants and was not forced to rely merely on their conclusions. The defendant specifically charges that the facts contained in the affidavit of Detective Ley are supported only by hearsay and do not present a sufficient ground for reliability. It is well established that hearsay may be the basis for the issuance of a search warrant if a substantial foundation for crediting the hearsay is shown. (*People v. Francisco* (1970), 44 Ill. 2d 373, 255 N.E.2d 413.) In the case before us

Judge Fitzgerald was aware of the underlying circumstances which formed the basis of the affiants' belief. Detective Ley's affidavit began:
"I, EDWARD LEY, am a detective for the Sheriff of Du Page County, Illinois, and I have participated in the investigation of the homicide of Sally Kandel."

In *People v. McGrain* (1967), 38 Ill. 2d 189, 230 N.E.2d 699, our supreme court held that "the observations of fellow police officers of the Government engaged in a common investigation, are plainly a reliable basis for a warrant applied for by one of the members."

It is apparent from the language of Detective Ley's affidavit that the facts relating to the location of the body, the traveling time by car from the D-C Warehouse to that location, the traveling distance by bicycle from the Kandel residence to that location, the cause of death, and the description of the murder weapon were all facts personally known to Detective Ley through his involvement in the investigation of the murder.

The affidavit also places the time of death shortly after 6 p.m. and attributes the discovery of this fact to Dr. Horowitz who he states is a pathologist. This credential contained in the affidavit certainly gives sufficient foundation for the judge to accept the assertion as fact.

The three other affiants spoke from personal knowledge and provided the judge with information that the defendant had been seen taking the murder weapon from the D-C Warehouse and carrying it in his car, that the defendant was absent from work from approximately 6 to 7:20 p.m. on the evening of the murder, that a human bite mark had been inflicted on the body of the victim, and that the bite mark on the victim was sufficiently clear to identify the dentition of the person who inflicted the bite.

The probable cause which must be present before a magistrate may issue a search warrant is short of proof of guilt beyond a reasonable doubt. *People v. Francisco* (1970), 44 Ill. 2d 373, 255 N.E.2d 413.

■■ We conclude and hold that the affidavits attached to the complaint for warrant provided sufficient probable cause for the issuance of the search warrant. Having so held, we need not discuss the defendant's further contention that this dental evidence was the direct result of an unlawful arrest. As the defendant concedes in his brief, the probable cause to search would also establish probable cause to arrest, and so taking the defendant into custody to obtain exemplars of his dentition was proper.

The defendant also maintains that the techniques employed to obtain the dental evidence amounted to an unconstitutional invasion of his right to privacy and a violation of his privilege against self-incrimination. He relies upon *Rochin v. California* (1951), 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205, where the United States Supreme Court found the act of

pumping the defendant's stomach against his will to be shocking and repulsive and therefore an invasion of his right to privacy. The situation in the instant case is not analogous.

■■ On January 24, 1973, the defendant was taken to a dental office in Wheaton, Illinois, and was asked to sit in a dentist's chair, while photographs and impressions were taken of his teeth. The defendant did not resist, and at no time was the defendant harmed or put in an uncomfortable position. The dentist whose office was being used testified that the defendant was treated courteously by the police and at no time did he indicate any pain, discomfort or reluctance to have the procedure performed. The techniques used to examine the defendant and to take impressions of his teeth were in accordance with the standard practice, and we cannot find that such procedures were shocking and repulsive. The nature of the procedures and the manner in which they were performed did not invade the defendant's right to privacy.

In *Holt v. United States* (1910), 218 U.S. 245, 252-53, 54 L. Ed. 1021, 1030, 31 S. Ct. 2, Mr. Justice Holmes, speaking for the U. S. Supreme Court, dealt with the admission of physical characteristics and the privilege against self-incrimination when he stated "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." This decision was cited as controlling by the United States Supreme Court some 55 years later when it stated that "the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends." *Schmerber v. California* (1966), 384 U.S. 757, 761, 16 L. Ed. 2d 908, 914, 86 S. Ct. 1826.

In *Doyle v. State* (1954), 159 Tex. Crim. 310, 263 S.W.2d 779, the Texas Court of Criminal Appeals was faced with a situation similar to that in the instant case. There, the police found a half-eaten piece of cheese at the scene of a burglary, and the State sought to introduce testimony comparing the bite marks found on the cheese, and bite marks voluntarily made by the defendant in a second piece of cheese at the request of the investigating officers. In rejecting the defendant's contention that his rights against self-incrimination had been violated, the court stated:

> "In Brown v. State, 156 Tex. Crim. Rep. 144, 240 S.W.2d 310, we held that Article 727 applied to verbal statements made by an accused under arrest and had no application to the taking of a specimen of his blood.
>
> In Henson v. State, No. 26, 609, (page 647, this volume), 266

S.W.2d 864, we held that the making of a paraffin test on the hands of the accused while he was under arrest did not violate his constitutional rights against self-incrimination.

In fact, we fail to perceive any material distinction between the case at bar and the footprint and fingerprint cases so long recognized by this court." 263 S.W.2d 779, 780.

A more recent case, directly on point, is *Patterson v. State* (Tex. Crim. App. 1974), 509 S.W.2d 857, where the court, at pages 862-63 said:

"We hold that to require the appellant to produce a mold of his teeth is not in violation of any constitutional protection. In *Olson v. State*, Tex. Cr. App., 484 S.W.2d 756, there was an extended discussion of the different kinds of physical evidence that are and are not within the protection of the Constitution. There we held handwriting examples to be compellable. We hold requiring a defendant's teeth marks is likewise compellable."

■■ We agree with the analysis of the Texas courts and therefore conclude that this contention is without merit. The dental impressions, like fingerprints, or voice exemplars, are fixed characteristics of the body of the defendant and as such do not fall within the ambit of the Fifth Amendment.

The defendant's second main contention is that the so-called "Bite-Mark" identification was not proven to be sufficiently reliable to permit its admission into evidence and that the admission of such evidence over his objection therefore constituted reversible error and deprived him of a fair trial.

The record contains over 1300 pages of dental testimony and numerous exhibits including photographs and impressions which were admitted into evidence at trial. Briefly, this evidence included the testimony of three State expert witnesses who asserted that, in their opinion, Richard Milone was without a doubt the perpetrator of the bite on the victim's thigh. The defendant, on the other hand, presented four expert witnesses who concluded that no positive correlation could be made between the defendant's dentition and the bite mark in question.

When Sally Kandel's body was found, in a state of extreme rigor mortis, it was taken to the morgue where the bite mark was observed and photographed. In addition, a silicone impression of the bite mark was made and clear plastic overlays were placed on the wound and the markings were traced on the plastic. These exhibits, along with the pictures and casts of the defendant's teeth provided the basis for the comparison made by all of the experts. There was ample testimony that because of the advanced state of rigor mortis, the victim's leg was immobile and thus there could be no distortion of the bite mark resulting

from movement of the leg. Dr. Lester Luntz, the State's leading expert testified that, in terms of quality for comparison purposes, the bite mark on the victim's thigh was an excellent specimen. The marks were clear, the quality of the marks was good, and because the victim was already deceased when the bite was inflicted, the skin and underlying tissue provided an unchanging medium for the marks. As the most experienced of the expert witnesses, Dr. Luntz testified that in the course of his work as a dentist and instructor in forensic dentistry he had seen between 200 and 300 bite marks in human skin and had been called upon to give his opinion in five bite-mark cases. In comparing the defendant's dentition to the bite mark in the instant case, Dr. Luntz enumerated 29 points of comparison between the marks and the defendant's dentition which led him to identify positively the defendant as the perpetrator of the bite. In addition, Dr. Luntz was able to produce an explanation for the distortion which appeared in one segment of the bite mark by inflicting bite marks on human skin, with casts of defendant's teeth.

Dr. Harold Perry, an orthodontist for 20 years and chairman of the Department of Orthodontics at Northwestern Dental School, testified that he had seen over 40,000 casts of teeth in his work and that in his opinion, every individual's dentition is as distinct as his fingerprints. He concurred with the positive identification made by Dr. Luntz and pointed out that less than 1% of the population would have a fracture of the left central incisor as was observed in the casts of the defendant's teeth and the bite mark on the victim. He stated that this correlation, along with a number of other outstanding characteristics present in both the mark and the defendant's dentition, could leave no doubt that defendant had inflicted the bite.

Dr. Irwin Sopher, M. D., dentist, and forensic pathologist, testified that, compared to numerous bite marks he had seen on human bodies or read about in forensic literature, the bite mark in question was good in terms of definity of points, clarity, lack of distortion, and lack of decompositional change. He also found numerous unique and specific points of identification which enabled him to concur with the other State experts in their positive identification of Richard Milone as the perpetrator of the bite.

The four forensic odontologists called by the defendant testified that it is far easier to exclude a suspect through bite-mark comparison than to positively identify a subject through the marks left by his teeth. All four pointed out areas of inconsistency between the bite mark and the moulds of defendant's teeth, and for this reason either denied that a positive identification could be made, or specifically ruled out the defendant as the person responsible for the tooth marks on the victim.

In rebuttal, the State witnesses explained why the inconsistencies pointed out by the defense experts existed, and steadfastly held that defendant's teeth made the impression on the victim's thigh.

The question of bite-mark identification is a matter of first impression before this court and we are compelled to comment that the record in this case reflects the utmost diligence and care in preparation by the investigating police, the State's Attorney, and counsel for the defendant. It must be realized that our synopsis of the dental testimony hardly does justice to the 1300 pages of intense examination which took place at trial, and, without the painsaking care exercised in preserving evidence, none of the dental testimony would have been available. Had the quality of the scientific or legal preparation been less thorough, we might have given less credence to this entire area of inquiry.

The defendant contends that the State should have been precluded from introducing such evidence to identify him as the perpetrator of the bite mark. Citing *Frye v. United States* (D. C. App. 1923), 293 F. 1013, he claims that bite-mark identification as a science has not "gained general acceptance in the particular field in which it belongs," and therefore should not be admissible in a court of law. In *Frye*, testimony interpreting the results of a "systolic blood pressure deception test" (lie detector) was disallowed as unreliable because it lacked the "necessary general acceptance." Also cited by the defendant is *People v. Jennings* (1911), 252 Ill. 534, 96 N.E. 1077, where our supreme court sustained the admission of fingerprint identification testimony for the first time. In that case, the court stated, at page 549:

> "We are disposed to hold from the evidence of the four witnesses who testified and from the writings we have referred to on this subject, that there is a scientific basis for the system of finger-print identification and that the courts are justified in admitting this class of evidence; that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it."

It is defendant's contention that the science of bite-mark identification fails to meet either the "general acceptance" test of *Frye*, or the "prior reliability" test of *Jennings* and is therefore unreliable and should have been excluded. He offers statements made by four forensic odontologists to support this contention, including a statement by Soren Keiser-Nielson, head of the Forensic Odontology Laboratory at the Royal Dental College in Cophenhagen, Denmark, who wrote that bite marks "can never be taken to reproduce accurately the dental features in the originator." (*International Dental Journal*, vol. 18, no. 3, at 670 (1968).) The State accurately points out, however, that nowhere does Keiser-Nielson assert that a positive identification cannot be made from a bite mark of good

quality, and in fact, in the same article he states "We know of no minimum number of concordant points which will permit us to claim identity, just as we have no means of evaluating the usefulness (discrimination potential) of such concordant points. This is not to say that a clear and comprehensive bite mark exhibiting several characteristic details could not become conclusive evidence against a suspect. Several cases of that type are on record."

Next, the defendant quotes a passage from Handbook for Dental Identification, written by State's expert, Dr. Lester Luntz, in which he states, "Up to now, awareness of the existence of bite marks has been scant; and their value as dental evidence is still being appraised." The defendant urges that this is an admission by the State's leading witness that the science of bite-mark identification has not reached a stage of general acceptance in the scientific community. Based upon Dr. Luntz' testimony during the trial, it is clear that this statement was meant to chastize investigating police and prosecuting attorneys for failing to take advantage of this identification tool in the past. Dr. Luntz' testimony leaves no doubt that he places great professional trust in the reliability of bite-mark identification under proper circumstances.

Defendant also quotes Gosta Gustafson, who states in his book Forensic Odontology that "All authors are unanimous that it is easier to state with assurance that bite marks were not made by a suspect than it is to show that they were." Even taken at face value, this statement does not preclude the possibility that under the proper circumstances, a positive identification can be made, and in fact, the defendant's own expert Dr. Levine acknowledged that Gustafson agrees that such identification is possible.

Finally, defendant proffers the testimony of his own witness, Dr. Lowell Levine who stated he never uses bite marks as the basis for a positive identification. When contrasted with the numerous articles in professional journals, it appears that Dr. Levine's opinion does not represent the consensus among forensic odontologists.

A lack of complete unanimity in the medical profession as to the reliability of certain scientific testimony does not mean that such testimony fails to satisfy the requirements of *Frye* or *Jennings*. In *People v. Bobczyk* (1951), 343 Ill. App. 504, 99 N.E.2d 567, the court reviewed testimony interpreting the results of a drunkometer. In upholding the admission of such testimony for the first time in Illinois, the court stated at pages 510-11 that:

> "Defendant argues that there is a lack of unanimity in the medical profession as to whether intoxication can be determined by breath. Even so we think this objection goes to the weight of the testimony and does not destroy its admissibility."

Another factor affecting the admissibility of scientific testimony involves the nature of the evidence being offered. In *Jennings*, the court refused to accept testimony based upon the workings of a machine (lie detector) which had not proved to be substantially reliable and the results of which were subject to various subjective interpretations. Bite-mark comparison, on the other hand, involves only a visual comparison between the wound and the dentition of the defendant. The great care taken to preserve and gather the physical evidence in this case precludes any problems arising in regard to the quality of the exhibits being compared. For this reason, the testimony of the experts serves only to lend assistance to the trial court in interpreting physical evidence not within the ken of the average trial judge's knowledge. There is no intermediate mechanical stage in which reliability may be questioned. Such evidence is more analogous to footprint, fingerprint, and hair, comparisons which are made for purposes of identification.

In *Commonwealth v. Devlin* (1974), ___ Mass. ___, 310 N.E.2d 353, the defendant was convicted of manslaughter and a critical portion of the State's case concerned the ability of the prosecution to identify the badly decomposed torso of the victim. Since the head and hands were missing, neither dental identification nor fingerprint identification was possible. Shortly before his disappearance, the victim had occasion to have X rays taken of his right shoulder and the prosecution sought to introduce the testimony of Dr. John Sosman, a radiologist, who positively identified the victim through a comparison of the prior X rays with X rays taken of the torso. Devlin argued, as does the defendant in this case, that the practice of X-ray comparison had not received "a general acceptance by the community of scientists involved." In rejecting this contention, the Supreme Judicial Court of Massachusetts noted that Dr. Sosman's own testimony established an adequate basis for stating his opinion. In his practice, Sosman had viewed over 100,000 X rays and had made over 300,000 comparisons. While Sosman acknowledged that only three or four people in the country performed such comparisons, the court upheld the admissibility of his testimony and distinguished this type of evidence from polygraph interpretations which had previously been disallowed in Massachusetts. The court differentiated between the interpretation of mechanical measurements such as print-outs from a polygraph, and testimony based upon direct observation of physical characteristics such as the characteristics of a bite mark and the known dentition of a suspect.

The unique quality of an individual's dentition has already been recognized by Illinois courts in *People v. Mattox* (1968), 96 Ill. App. 2d 148, 237 N.E.2d 845, where the court stated at pages 150-51:

> "Although a question of first impression in this State, it cannot be seriously disputed that a dental structure may constitute a means of

    ·  identifying a deceased person, otherwise unrecognizable, where there is some dental record of that person with which the structure may be compared. Comparison of dental structures falls within the category of circumstantial evidence and involves the question of weight and credibility, rather than that of competency. See generally 86 ALR 2d 722, et seq.; e. g., People v. Donaldson, 8 Ill. 2d 510, 515, 134 N.E.2d 776; People v. Jones, 382 Ill. 603, 48 N.E.2d 364."

The concept of identifying a suspect by matching his dentition to a bite mark found at the scene of a crime is a logical extension of the accepted principle that each person's dentition is unique.

So far as we can ascertain, the only Illinois case involving a bite mark on a human victim is *People v. Johnson* (1972), 8 Ill. App. 3d 457, 289 N.E.2d 722. There, in a rape case, the defendant was taken to a dentist's office where a cast was made of his teeth. At the trial, in addition to other evidence, there was testimony by an oral pathologist based on his comparison of this cast with a photograph of teeth marks on the victim's breasts. On appeal, the defendant contended, *inter alia*, that the physical evidence was "inconclusive" and "equivocal" and failed to establish "an abiding belief in defendant's guilt." In affirming the judgment, the court, after summarizing other evidence, at page 461, said:

    " * * * Finally an oral pathologist. in comparing a cast of defendant's teeth with a photograph of the teeth marks on complainant's breasts expressed the opinion that it was highly probable the teeth marks on the breasts were made by Johnson's teeth."

The State has cited numerous articles in scientific journals which deal with the identification of a suspect through bite-mark comparison. In addition, an entire article appearing in 25 Am. Jur. Proof of Facts 765-85 (1970) has been given over to the topic "Identification of Tooth Marks." While most recorded cases have arisen in foreign countries, there are instances where American reviewing courts have dealt with the admissibility of bite-mark identification testimony. In *Doyle v. State* (1954), 159 Tex. Crim. 310, 263 S.W.2d 779, mentioned above, the Texas Court of Criminal Appeals considered the testimony of a dentist who gave his opinion that the teeth marks voluntarily made by the defendant in a piece of cheese were made by the same teeth as those which left marks in a piece of cheese found at the scene of the crime. This testimony was relied upon by the appellate court finding the evidence sufficient to support the conviction.

In *Patterson v. State of Texas* (Tex. Crim. App. 1974), 509 S.W.2d 857, also mentioned above, the Texas Court of Criminal Appeals upheld a murder conviction, and in doing so, sustained the admissibility of positive

bite-mark identification of the defendant as the person who inflicted a bite mark on the left breast of the deceased. As in the case at bar, Patterson produced expert witnesses who attacked the identification technique employed by the State experts, and testified that in their opinion, the bite mark was not inflicted by Patterson. In sustaining the conviction, the court of appeals ruled that the testimony of the defense experts goes to the weight to be given the identification evidence, rather than to its admissibility.

In the recent decision *People v. Marx* (1975), 54 Cal. App. 3d 100, 126 Cal. Rptr. 350, the California Court of Appeals dealt directly with the question of bite-mark identification. In that case, the defendant was convicted of murder and there was extensive expert testimony matching the defendant's dentition to a bite mark found on the nose of the deceased. The central issue in *Marx* was the admissibility of this expert testimony, and after discussing the requirements of *Frye*, the court stated at page 111:

> "What is significantly different about the evidence in this case is this: the trier of fact, here the court, was shown models, photographs, X-rays and dozens of slides of the victim's wounds and defendant's teeth. It could see what we have seen in reviewing the exhibits to determine the admissibility of the evidence. First, for example, the extent to which the appearance of the wounds changed between the time that the autopsy was performed and the time that the body was exhumed in Dallas. Second, the extent to which the purported bite marks appear to conform generally to obvious irregularities in defendant's teeth. Thus the basic data on which the experts based their conclusions were verifiable by the court. Further, in making their painsaking comparisons and reaching their conclusions, the experts did not rely on untested methods, unproven hypotheses, intuition or revelation. Rather, they applied scientifically and professionally established techniques—X-rays, models, microscopy, photography—to the solution of a particular problem which, though novel, was well within the capability of those techniques. In short, in admitting the evidence, the court did not have to sacrifice its independence and common sense in evaluating it."

■■ Similarly, in the instant case, the trial judge was correct in allowing expert testimony to aid his comparison between the bite mark on Sally Kandel's thigh and the dentition of the defendant. The weight given this testimony was within the province of the court, and nothing in the record indicates that the trial judge abused his discretion in allowing the testimony. Keeping in mind the excellent quality of the dental

evidence introduced at trial, we conclude and hold that it was properly admitted.

■■ Finally, the defendant claims that the evidence at trial was insufficient to prove his guilt beyond a reasonable doubt. On review in a criminal cause, this court will not reverse a judgment of conviction unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to justify entertaining a reasonable doubt of defendant's guilt. (*People v. Lobb* (1959), 17 Ill. 2d 287, 161 N.E.2d 325.) There was extensive testimony that Sally Kandel was murdered with the shopping cart handle which the defendant carried around as his personal weapon for two weeks prior to the crime. The defendant was absent from his place of employment for nearly an hour and a half on the evening of the murder and when he returned it appeared that he had cleaned up and changed his shirt. He commenced to lie about his whereabouts during this absence and he continued to lie to detectives investigating the murder. The description given by nine-year-old Linda Roseboom of the car she saw between 6 and 7 p.m. in her driveway next to the scene of the crime, accurately described the car driven by the defendant, and her observation that the driver had very long sideburns is consistent with defendant's appearance on the evening of the murder. This evidence alone is sufficient to support the trial judge's finding.

When coupled with the positive identification of the defendant as the perpetrator of the bite on the victim's thigh, we conclude and hold that the defendant's guilt was proved beyond a reasonable doubt.

We therefore affirm the judgment.

Affirmed.

GUILD, P. J., and SEIDENFELD, J., concur.