THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DENNIS J. FERGUSON, Defendant-Appellant.

Second District No. 2—85—0312

Opinion filed June 30, 1988.

Robinson & Skelnik, of Elgin (Mary Robinson, of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Marshall Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Dennis Ferguson, appeals from convictions on five counts of murder and one count each of armed robbery, deviate sexual assault, and home invasion. Defendant was sentenced to imprisonment for natural life on one of the murder convictions, and to concurrent terms of 30 years each on his convictions for armed robbery, deviate sexual assault, and home invasion. Although defendant raises

seven issues on appeal, our disposition rests on the resolution of defendant's allegation that the trial court erred in admitting expert testimony on a scientific process that has not been generally accepted in the expert's scientific community (identification of a person who made a shoe print by comparing wear patterns of a shoe known to have been worn by the person with wear patterns of a shoe print found at the crime scene but made from a different shoe). We agree and accordingly reverse and remand this case for a new trial.

On April 17, 1984, at approximately 12:40 a.m., Andrea Young was discovered on the front porch of a neighbor's home, partially clad, and bleeding from 18 stab wounds in her head, neck, and hands. Andrea told police at the scene that an unknown attacker broke into her home and tried to rape and kill her. Andrea was transported to the hospital where she later died from an excessive loss of blood.

Investigators determined from evidence taken at the scene that Andrea was stabbed on the front porch of her home at 907 Chatham, in Elmhurst, Illinois, and went to her neighbor's home at 911 Chatham for help. Andrea's purse and its contents were found on her front porch along with a large amount of blood. The inside of Andrea's house was in disarray, and her clothes were scattered about the front entranceway and living room. Police discovered an open window and damaged window frame in one of the bedrooms. In addition, there were pry marks on the back door and wood chips on the threshold indicating an attempted entry at that location. Police also found jewelry scattered throughout the house and evidence of an item missing from the top of a dresser in one of the bedrooms. Partial and full shoe prints were found in white powder in the living room and hallway. Shoe prints were also found in the mud in Andrea's backyard and in the backyards at 911 and 919 Chatham. Additional jewelry was found in the backyard at 911 Chatham, and a jewelry box was found behind the garage at 919 Chatham. Five plaster casts were made from the shoe impressions found in the mud at 907, 911, and 919 Chatham. One of those impressions revealed a logo partially identified as "J.O." The officer who cast the impressions did not know their age and acknowledged that rain could destroy or alter the impressions. The record indicates that it rained on both April 16 and 17, 1984. One of the casts was broken at the time it was made and all of the casts were broken at the time of trial. On April 19, 1984, a large blood-stained knife and sheath were discovered in the backyard at 904 Chatham along with additional shoe prints.

On April 21, 1984, defendant consented to a search of his home in Bellwood, Illinois. A shoe box bearing the logo "J.O.X." was recov-

ered from a trash bag in a bedroom defendant shared with a younger brother. Defendant was questioned and released after voluntarily providing police with photographs, fingerprints, and hair samples. Defendant was arrested on April 26, 1984, and police seized a pair of black canvas shoes he was wearing at that time. Police subsequently returned to defendant's home and seized a 10-speed bicycle, a pair of brown boots, and a pair of grey oxfords. The shoes were taken from the bedroom defendant shared with his brother. No "J.O.X." brand shoes were found. Defendant was charged by indictment with five counts of murder, two counts of home invasion, two counts of attempted residential burglary, and one count each of residential burglary, deviate sexual assault, and armed robbery. Prior to trial, the court severed the burglary and attempted burglary counts, and the State announced that it would seek the death penalty. A jury was subsequently impanelled, at which time the State routinely asked the panel members whether they would hold the State to a higher standard of proof beyond a reasonable doubt due to the nature of the case. Of the 14 panel members selected to hear the case, only one juror and one alternate were not asked these questions.

At trial, the State offered evidence of several Elmhurst burglaries and attempted burglaries occurring in early 1984. The State represented to the court that an expert witness would connect defendant to shoe prints found at locations associated with those crimes. The State further introduced testimony that the burglaries had characteristics similar to the instant action and argued that the other crimes' evidence was admissible under the *modus operandi* theory to identify defendant as the perpetrator in the instant action. The court allowed the evidence to go to the jury. In each case, the victims testified that the intruder entered or attempted to enter their homes at night through a rear door. Three of the witnesses testified that the intruder took their purses, which were located near the rear doors. Purses from two of the burglaries were recovered missing amounts of cash; however, one of the victims, Geraldine Collins, testified that her purse was also missing several credit cards and two Illinois Bell calling cards. Except for the Collins burglary, photographs and plaster casts were taken of shoe prints found at locations associated with the burglaries. Records of phone calls charged to the Collins' Illinois Bell account from April 6, 1987, revealed calls made on that date to telephone numbers belonging to Bellwood residents Carolyn Sproles and Paula Johnson. Both Sproles and Johnson testified that they received calls from defendant on that date.

The State also introduced the testimony of Anita Cason. Cason

testified that in late 1983 or early 1984, she and defendant went to the Melrose Park Thom McAn shoe store, where she bought defendant a pair of "J.O.X." brand athletic shoes. Cason testified that defendant placed the shoes back in the box after trying them on, but acknowledged on cross-examination that she had previously told police that defendant disposed of the box and wore the shoes out of the store. Cason further testified that defendant told her on several occasions that he was going to Elmhurst and entering homes through open doors and windows at night. Cason stated that on April 4, 1984, defendant gave her the Collins' credit cards and Illinois Bell calling cards and told her that he got them in Elmhurst. Cason also testified that she was questioned by police and later informed defendant of that fact. According to Cason, defendant denied knowledge of any murder and stated that he was getting the credit cards from someone else. Cason further stated that on April 23, 1984, defendant told her to get rid of the calling cards because police were trying to use those cards to implicate him in a murder.

Sam Lombardo, manager of the Melrose Park Thom McAn shoe store, testified that Thom McAn used the brand name "J.O.X." on its athletic shoes and sold about 15 different styles of athletic shoe from April 1983 to April 1984. Lombardo identified the shoe box seized from the trash in defendant's bedroom through identification on the box indicating that it was received at the Melrose Park store in the fall of 1983 and contained a size 10½D shoe. Store records indicated that between August 1983 and April 1984, there were two sales of the shoe identified by the stock number on the shoe box; one being a size 7½, and the other being a size 10½.

Dr. Louise Robbins, a physical anthropologist and associate professor at the University of North Carolina, was called to testify as an expert on shoe print identification. Robbins testified that the anthropological structure of every human being is unique and explained through the use of slides and measurements that each person has a unique foot impression. Robbins stated that the unique impression made by the human foot on the inside of a shoe is directly reflected by the wear patterns produced on the sole of the shoe and concluded that the wear patterns on the sole of a shoe are unique to the person who wore the shoe. Robbins stated that while no set number of measurements is necessary to make an identification from a shoe print, an identification is possible when "the number of similarities reach the point of beyond a reasonable doubt." After defendant's objection to this characterization was overruled, Robbins explained that she compared shoe prints by using four basic measurements, starting with to-

tal length, width across the ball, width across the arch, width across the heel, and "any additional measurements that are needed with regard to pattern and distribution of wear sites on the bottom of the shoe." When cross-examined on her qualifications, Robbins acknowledged that she had never taken a course on the wear characteristics of shoes or on comparing shoe prints or wear patterns. Robbins further acknowledged that she was not aware of any study on individual traits exhibited by shoe prints or footprints, nor was she aware of any studies other than her own regarding the ability to analyze shoe prints for the purpose of identifying the person who made the shoe print. Robbins was also unable to name anyone in the United States who had developed similar techniques and, although naming four persons in other countries who were doing or had done that "type of work," acknowledged that one of those authorities published a book in which he stated that the identity of a shoe wearer could not be determined from shoe wear patterns alone. Robbins testified that she had not read anything by that author indicating he had changed his opinion, nor was she aware of any published material refuting his findings. Robbins was allowed to testify as an expert after the trial court concluded that her methods were sufficiently reliable.

Robbins testified that she examined the plaster casts and photographs of shoe impressions in the instant action and determined that the casts had a tread design similar to an athletic shoe bearing the "J.O.X." brand name. Robbins also examined the three pairs of shoes seized by police and concluded that the soles of all six shoes had a distinctive wear pattern. While none of the shoes seized by police made the shoe prints represented in the casts and photographs, Robbins measured and compared the wear patterns on the plaster casts and the three pairs of shoes and concluded that the same person who wore the shoes seized by the police wore the pair of shoes that made the shoe prints represented in the casts. Robbins gave identical testimony regarding the similarity of wear patterns found on the casts and photographs associated with the attempted and actual Elmhurst burglaries. Robbins concluded that the same pair of shoes made all the shoe prints, and all the shoe prints were made by the same person who wore the shoes seized by police. Robbins further testified that the tread design and wear pattern reflected on the photographs of the shoe prints found on the white powder in Young's house were consistent with those found on the casts.

In addition to Robbins' testimony tying defendant to the shoe prints, the State also introduced the testimony of forensic scientist Patricia Hamby. Hamby analyzed various standards of blood, hair, and

body fluids taken from both Andrea and defendant. Among her conclusions were that both Andrea and defendant had the same blood type and that blood type was the same as was found on the knife and in semen found on Andrea. Hamby further testified that while two strands of hair found at the scene were consistent with those of defendant, she could not identify defendant as the only possible source of the hairs.

Among the witnesses testifying for defendant, defendant's brother Vincent testified that in March 1984, he found the "J.O.X." shoe box in the trash at school and used it to carry home a pair of cleats loaned to him by his track coach. Vincent's track coach acknowledged that he did loan Vincent a pair of track cleats in March or April 1984. Vincent stated that he shared a room with his brother Chris, and defendant shared a room with his brother Kevin. Both Vincent and Kevin testified that each of the brothers, including defendant, regularly wore each other's clothes and shoes. Both said the black canvas shoes belonged to Kevin, the grey oxfords belonged to Chris, and the boots belonged to defendant. Vincent and Kevin also testified that none of the brothers owned any "J.O.X." brand athletic shoes.

Defendant denied all involvement in the crime and further denied that he had ever been in Elmhurst prior to April 21, 1984. Defendant asserted that he bought the Collins' calling card number for $5 and, on April 6, 1984, used the number to call Pamela Johnson and Caroline Sproles. Defendant testified that he knew Anita Cason but denied ever giving her credit cards or shopping with her. Defendant testified that he was at his girlfriend's house at 10 p.m. on April 16, 1984, and spent the entire night at that location. Cheryl Horton, defendant's girlfriend and the mother of defendant's child, testified that defendant came to her house around 10 or 10:15 p.m. on April 16, 1984, and remained with her the entire night. Horton stated that she was watching either "Soap" or "Mash" on television when defendant arrived. In rebuttal, the State called the director of programming for WGN television, who testified that the program "Soap" was not shown on April 16, 1984.

At the close of the evidence, the court granted the State's motion to nol-pros one of the counts for home invasion. During closing arguments, the prosecutor told the jury that in order to find defendant not guilty they must believe that all of the State's witnesses lied and all of defendant's witnesses, including defendant, told the truth. A similar comment was made in the rebuttal argument. In addition, the prosecutor argued that defendant was identified by both hair analysis

and shoe print comparison, and on two occasions told the jury that the person who had written a book questioning the reliability of shoe wear pattern identification had since refuted his conclusions. Finally, the prosecutor argued that Vincent Ferguson's track coach "told you here this morning he never gave Vincent the track spikes." The jury subsequently returned verdicts finding defendant guilty of five counts of murder, and one count each of armed robbery, home invasion, and deviate sexual assault. The court entered judgment on all five counts of murder and each of the additional counts. Defendant waived a jury for purposes of sentencing, and the court denied defendant's post-trial motion. Defendant was sentenced to natural life on one count of murder, and to concurrent terms of 30 years each for armed robbery, deviate sexual assault, and home invasion. Defendant filed this timely appeal.

Defendant first contends that it was error for the trial court to allow Robbins to give identification testimony from the analysis of shoe wear patterns on shoes that did not make the shoe prints found at the crime scene. Defendant argues that such testimony was improper since it was premised on theories not generally accepted within the scientific community of which Robbins is a member. We agree.

While it should initially be noted that testimony regarding shoe print and shoe wear comparison for the purpose of identification is not a new concept in Illinois, each of the cases that have used shoe print identification have involved the comparison of shoe prints to the shoes suspected of making those shoe prints. (See *People v. Hanson* (1964), 31 Ill. 2d 31, 39-40; *People v. Diaz* (1988), 169 Ill. App. 3d 66, 71; *People v. Henne* (1988), 165 Ill. App. 3d 315, 325; *People v. Howard* (1985), 130 Ill. App. 3d 967, 970; *People v. Ricketts* (1982), 109 Ill. App. 3d 992, 997-98; *People v. Gordon* (1981), 94 Ill. App. 3d 764, 766; *People v. Lomas* (1981), 92 Ill. App. 3d 957, 959-60; *People v. Robbins* (1974), 21 Ill. App. 3d 317, 321-23; *People v. Stanbeary* (1970), 126 Ill. App. 2d 244, 250.) Unlike the Illinois cases cited above, the instant action *does not* involve the comparison of a shoe print with *the shoe suspected of making the print*. Rather, here the identification is essentially made by comparing shoe wear patterns from different pairs of shoes on the theory that wear patterns are unique and can be used to identify the shoe wearer. Thus, the issue before this court is whether there is a sufficient scientific basis for an expert to render an opinion regarding that type of analysis.

 An individual may testify as an expert if his experience and qualifications afford him knowledge uncommon to lay persons and

where such testimony will aid the trier of fact in reaching its conclusion. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208.) In determining whether an expert is qualified to render an opinion based on a scientific theory, Illinois follows the test set forth in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. (See *Jordan*, 103 Ill. 2d at 208; *People v. Baynes* (1981), 88 Ill. 2d 225, 241.) The *Frye* court stated:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (*Frye*, 293 F. at 1014.)

Thus, the rule in Illinois regarding the admissibility of expert testimony based on a scientific theory requires that the theory first have gained "general acceptance" in the expert's scientific field. (*Jordan*, 103 Ill. 2d at 208.) The burden of establishing the qualifications of an expert witness is on the proponent of his testimony, and it is within the discretion of the trial court to determine whether the witness has been qualified. 103 Ill. 2d at 208.

■ Applying the *Frye* "general acceptance" test to the facts of the instant action, we must conclude that the trial court abused its discretion in permitting Robbins to testify as an expert witness. Robbins testified that the wear patterns on the soles of shoes are unique to the individual who wore the shoes, and by measuring the wear patterns on the soles of different pairs of shoes, she can determine within a reasonable degree of scientific certainty whether the same person wore both pairs of shoes. *By her own testimony* Robbins stands alone in the anthropological community regarding the belief that an identification can be made solely by measuring and analyzing the wear patterns on the soles of shoes. Robbins acknowledged that she was not aware of any studies other than her own regarding the ability to analyze shoe prints for the purposes of identifying the person who made the shoe prints, nor was she aware of anyone in the United States who had developed similar techniques. Although Robbins was able to name four persons from other countries who were doing or had done that "type of work," she admitted that one of those authorities had published a book in which he concluded that the identity of a shoe wearer could not be determined from analyzing shoe wear patterns alone. There is no evidence in the record indica-

ting that any one other than Robbins employed the theory used to make the identification in this case. Thus, Robbins' theory cannot be said to have gained general acceptance in the scientific community.

Despite Robbins' singularity of opinion, the trial court found her testimony reliable in that she was using "scientific standards of measurement, uniqueness and a relationship between individuals that can be differentiated." In so ruling, the court cited our decision in *People v. Milone* (1976), 43 Ill. App. 3d 385, noting that in *Milone*, a case involving identification from bite mark comparisons, there was also a "scarcity" of experts. *Milone* is distinguishable from the instant action in several respects. First, the *Milone* court had the benefit of seven experts testifying on the uniqueness of a person's dentition and also had access to scientific journals regarding the scientific process used. (*Milone*, 43 Ill. App. 3d at 392-94.) In the instant action, the only evidence regarding the uniqueness of shoe wear patterns on the soles of shoes came from Robbins' testimony. More significantly, the *Milone* court did not apply the *Frye* test to determine the admissibility of the scientific opinions offered in that case. (See 43 Ill. App. 3d at 396.) Instead, the court recognized an exception to the *Frye* test of admissibility where the scientific process used does not involve an intermediate mechanical stage. (43 Ill. App. 3d at 396; see also *People v. Columbo* (1983), 118 Ill. App. 3d 882, 959-60.) In both *Milone* and *Columbo*, a case involving identification from hand print comparisons, the courts distinguished between scientific processes using an intermediate mechanical stage in which reliability may be questioned from those using only visual analysis such as footprint, fingerprint, and hair comparisons. (*Columbo*, 118 Ill. App. 3d at 960; *Milone*, 43 Ill. App. 3d at 396.) The *Columbo* court concluded that an expert's testimony regarding the results of such a scientific process is admissible "once a competent expert testifies that the scientific process in question is reliable." (*Columbo*, 118 Ill. App. 3d at 960.) Curiously, this standard was most recently applied in a case involving gastric analysis of stomach contents to determine the time of a person's death. See *People v. Hendricks* (1986), 145 Ill. App. 3d 71, 98 (holding that "general acceptance is not a prerequisite if the evidence is otherwise shown to be reliable").

Because the comparisons in the instant action are, like those in *Milone* and *Columbo*, subject only to a visual analysis, we have reviewed that line of cases to determine whether a standard less stringent than the *Frye* "general acceptance" test is applicable to these facts. We note that in enunciating and applying this less stringent standard, *Hendricks, Columbo,* and *Milone* cite *People v. Jennings*

(1911), 252 Ill. 534. (*Hendricks*, 145 Ill. App. 3d at 98; *Columbo*, 118 Ill. App. 3d at 959; *Milone*, 43 Ill. App. 3d at 394.) *Jennings* involved the then-novel process of fingerprint identification. (*Jennings*, 252 Ill. at 546.) However, while *Jennings* predated the *Frye* decision, the test it set up for the admissibility of evidence is not unlike the "general acceptance" test articulated in *Frye*. *Jennings* recognized the admissibility of the evidence in that case only after concluding that there was a "*scientific basis* for the system of finger-print identification" and that "method of identification [was] in such *general and common use* that the courts [could not] refuse to take judicial cognizance of it." (Emphasis added.) 252 Ill. at 549.

In the instant action, while there is arguably a scientific basis in Robbins' *theory* (*i.e.*, measurement techniques), her *theory* is not only not generally accepted in her scientific community, but is also not shared with *any other member* of her field. More importantly, and perhaps obvious, there is no evidence that this method of identification "is in such general and common use that the courts cannot refuse to take judicial cognizance of it." (See 252 Ill. at 549.) Thus, even under *Jennings* and the cases which interpret *Jennings* to create a standard less stringent than "general acceptance," Robbins' testimony cannot stand. We therefore conclude that the trial court's reliance on *Milone* was misplaced.

The State has nonetheless provided us with copies of decisions from foreign jurisdictions in which courts have allowed Robbins to testify as an expert. While each of these cases adopt Robbins' theory that a person's foot impression is unique, they do not involve her theory that shoe wear patterns are unique, nor do they involve an identification from *shoe wear patterns* on shoes that *did not* make the impressions left at the crime scene. (See *United States v. Ferri* (3d Cir. 1985), 778 F.2d 985, 988; *People v. Knights* (1985), 166 Cal. App. 3d 46, 53, 212 Cal. Rptr. 307, 312; *State v. Bullard* (1984), 312 N.C. 129, 140-42, 322 S.E.2d 370, 376-77; *State v. Maccia* (1984), 311 N.C. 222, 225, 316 S.E.2d 241, 243.) Moreover, two of these jurisdictions do not follow the *Frye* "general acceptance" standard of admissibility. (See *Ferri*, 778 F.2d at 988; *Bullard*, 312 N.C. at 146, 322 S.E.2d at 380.) In *Knights*, the court did find the *Frye* "general acceptance" test satisfied after concluding that Robbins based her opinion on "scientifically established measurement techniques" (*Knights*, 166 Cal. App. 3d at 53, 212 Cal. Rptr. at 312); however, in our opinion such an application of *Frye* is far too broad. *Frye* identifies the "thing from which the deduction is made" as a "scientific principle or discovery." (*Frye*, 293 F. at 1014.) We construe the "thing from which the deduction is

made" in the instant action as not simply scientific standards of measurement, but rather Robbins' theory that shoe wear patterns are unique and an identification can be made by comparing them. As noted above, since Robbins stands alone in the anthropological community regarding that belief, it cannot be said that her theory has been generally accepted in the scientific community to which she belongs.

■ We hold that the trial court abused its discretion in allowing Robbins to testify as an expert in this case. Robbins' status as an expert on shoe print identification through wear pattern comparisons and her conclusion that defendant wore the shoes that made the shoe prints at the scene may have so influenced the jury that defendant was denied a fair trial. Accordingly, this case is reversed and remanded for a new trial. We further find that remanding this case for a new trial will not subject defendant to the risk of double jeopardy since, in our opinion, the evidence presented was not insufficient to support defendant's convictions. (See *People v. Taylor* (1979), 76 Ill. 2d 289, 309; *People v. Threzzy* (1987), 163 Ill. App. 3d 180, 185.) While we conclude that a new trial is warranted on our disposition of this issue alone, we are nonetheless constrained to briefly comment on several of defendant's remaining issues.

First, defendant also contends that the trial court erred in admitting evidence of other crimes under the *modus operandi* theory to establish defendant's identity as the perpetrator in the instant action. This evidence consisted of three completed and two attempted burglaries. We note that the State tied defendant to these other crimes through its representation to the court that Robbins' testimony would establish that defendant made shoe prints at locations associated with those crimes. We further note that the trial court ruled the evidence admissible based on the State's representations of what Robbins' testimony would show. Inasmuch as we have held Robbins' testimony inadmissible, the basis for the court's ruling can no longer stand. However, because the State may introduce the evidence of other crimes on retrial under a basis independent of Robbins' testimony, we decline to reach the merits of defendant's contention that the crimes are too dissimilar to be admissible, leaving that decision instead for the trial judge in the first instance.

■ Next, defendant also contends that he was denied a fair trial by certain comments of the State and State's expert witness. We address this issue only to the extent that it will provide some guidance to the bar regarding improper argument. After reviewing the record we conclude that even were we to have found Robbins' testimony ad-

missible, reversible error was committed by the State during its closing argument.

In the instant action, the prosecutor stated of his witnesses:

"You have to believe that they are all lies [*sic*] or fools, everyone of them. And for you to find the Defendant not guilty of the charges, he has before him, you have to believe he told you the truth. You have to feel his brothers told you the truth. And that all of the persons I just named are liars and fools. It is your decision."

Initially, we note that defendant did not object to this form of argument. In the absence of an objection, improper remarks will be considered only if they are so prejudicial as to deprive the defendant of a fair trial or so flagrant as to threaten deterioration of the judicial process. (*People v. Alvarez* (1981), 93 Ill. App. 3d 111, 117; see also *People v. Roman* (1981), 98 Ill. App. 3d 703, 707.) For a prosecutor to inform a jury that in order to believe the defense witnesses the jury must find that each of the State's witnesses was lying is such a misstatement of law as to prejudice the defendant and deny him a fair trial. *People v. Cole* (1980), 80 Ill. App. 3d 1105, 1108.

In *Roman*, this court reviewed remarks similar to those in the instant action to determine whether they rose to the level of plain error. (*Roman*, 98 Ill. App. 3d at 707.) In that case, we held that it was improper for the prosecutor to argue that a jury would have to find that all of the State's witnesses lied in order to acquit the defendant. (98 Ill. App. 3d at 708; see also *People v. Crossno* (1981), 93 Ill. App. 3d 808, 821-22; *Cole*, 80 Ill. App. 3d at 1108.) However, we further held that the remarks did not rise to the level of plain error inasmuch as the prosecutor did not dwell on them at length and did not improperly put his own credibility behind the State's witnesses. (*Roman*, 98 Ill. App. 3d at 708.) In so ruling, we distinguished *Cole*, noting that the comments in *Cole* were particularly egregious since the witnesses did not contradict each other and could have been mistaken rather than lying in their testimony identifying the defendant. (98 Ill. App. 3d at 707.) Such a distinction is not applicable in the instant action since, as in *Cole*, the main issue is identification, a matter about which the witnesses may have been mistaken. In addition, unlike *Roman*, the comments in the instant case were repeated several times. In any event, the cases are clear in their universal condemnation of this form of argument. (See 98 Ill. App. 3d at 708; *Crossno*, 93 Ill. App. 3d at 821-22; *Cole*, 80 Ill. App. 3d at 1108.) While it appears that the argument in this case was prejudicial as well, these comments coupled with the prosecutors' frequent misstatements of the evidence and

other references to the burden of proof throughout the trial certainly had the cumulative effect of denying defendant a fair trial. We are distressed to discover that prosecutors have failed to heed numerous warnings and continue to perpetuate these errors in closing argument. While we in no way wish to be construed as discouraging zealous advocacy, we note only that such zeal, in its misapplication, may inadvertently undermine an otherwise well-presented case. Further admonition in this regard should not be necessary.

For the reasons set forth above, the judgment is reversed, and the cause is remanded to the trial court for a new trial.

Reversed and remanded.

DUNN and NASH, JJ., concur.