¶ 59. The majority takes the opportunity to conclude once and for all that forensic ondontology evidence is universally admissible, essentially the same as fingerprints and DNA testing, and is permissible in Mississippi regardless of the quality of that evidence and regardless of the fact that the proponent of that evidence claims that two indentations are teeth marks *Page 748 
unique to one person in the world. This is done despite the fact that the discipline is without any universal criteria or methodology. I dissent because, not only do I have qualms about proclaiming that bite-mark evidence is admissible to specifically identify a person and exclude everyone else, I also have reservations about Michael West's unmatched ability to conclude that no one other than the defendant could have produced the marks on the deceased especially where, as here, other experts are unwilling to testify that the marks could only be bite marks and not something else.
¶ 60. I recognize that a majority of courts taking up this issue have ruled that bite-mark evidence is admissible. Nonetheless, as pointed out in Faigman, Kaye, Saks Sanders, Modern Scientific Evidence: The Law and Science of Expert Testimony, § 24-1.0, at 156 (West 1997), courts that have admitted bite-mark evidence have done so despite the fact that forensic odontologists "were more doubtful about whether the state of their knowledge permitted them to successfully accomplish the challenging task of identifying a perpetrator `to the exclusion of all others.'" The admission by the courts of this testimony "apparently convinced the forensic odontology community that, despite their doubts, they really were able to perform bite mark identifications." Id. at 157-58. Notwithstanding the fact that the experts themselves were sorely divided over whether a defendant could be uniquely identified on the basis of his teeth marks, courts routinely held that such disagreements went to the weight of the evidence rather than its admissibility. Id. at 161.[1]
¶ 61. Thus, courts routinely admit bite-mark evidence even though there are many areas in forensic bite-mark identification about which there is still disagreement among its practitioners. Id. § 24-2.3 at 178.[2] One of these areas, and a not insignificant one, is what constitutes a bite mark. Id. at 180. In the instant case, Brooks's expert testified that he could not be certain that the marks, consisting of only "two linear marks", were human bite marks. They "could have been made by any number of things", Dr. Mincer opined. Dr. West, of course, testified that with the aid of ultraviolet light he was able to identify marks that could have been made by nothing other than Brooks's teeth.
¶ 62. This is not the first time that Dr. West has been able to boldly go where no expert has gone before. In Harrison v. State,635 So.2d 894, 897 (Miss. 1994), West testified that the victim's body was covered in teeth marks inflicted by the defendant. On appeal, Dr. Mincer gave an affidavit to the effect that the marks appeared to be ant bites. In Davis v. State, 611 So.2d 906, 910 (Miss. 1992), West concluded that "the wound was a bite mark consistent with having been inflicted approximately three weeks previously." But Dr. Richard *Page 749 
Souviron, a forensic odontologist from Miami, Florida, "testified that the wound on Davis' arm was not a bite mark, but even if it were, it was inconsistent with Mrs. Davis' teeth."
¶ 63. West's propensity for testifying with a confidence seen in no other expert has been documented by Paul Gianelli in The Abuse ofScientific Evidence in Criminal Cases: The Need for IndependentCrime Laboratories, 4 Va. J. Soc. Pol'y Law 439 (1997). Seealso Marcia Coyle, "Expert" Science Under Fire in Capital Cases, Nat'l L.J., July 11, 1994, at A23. Gianelli presents the following summaries:
 A. State v. Maxwell
 In State v. Maxwell, a capital murder case, West testified that a butcher knife blade "indeed and without doubt" caused skin wounds on two victims and a slash mark on a door. Moreover, the broken handle of the knife "indeed and without doubt" caused bruises on the accused's hand. This testimony was virtually the only evidence connecting Maxwell to the murders. West used alternate light imaging (which he somewhat immodestly dubbed the "West Phenomenon") to detect and analyze the wounds. He testified that this phenomenon, which he was unable to photograph, was a generally accepted scientific technique. Nevertheless, the three experts, who West claimed used his procedure, later testified that this was not so. Maxwell's attorney, John Holdridge of the Mississippi and Louisiana Capital Trial Assistance Project, filed complaints about West with professional organizations. An ethics committee of the American Academy of Forensic Sciences [AAFS] concluded that West had "misrepresented data in order to support his testimony" and that the term "indeed and without doubt" was unwarranted. Similarly, an ethics committee of the American Board of Forensic Odontologists [ABFO] concluded that West had "materially misrepresented the evidence and data." It also concluded that the "West Phenomenon" was not "founded on scientific principles" and that West had presented testimony "outside the field of forensic odontology." Finally, the Crime Scene Certification Board of the International Association of Identification [IAI] concluded (but only by a majority) that there was a basis for the complaint and provided West with an opportunity to relinquish his "Senior Crime Scene Analyst" certification.[3]
 B. State v. Oppie
 In another capital case, State v. Oppie, Dr. West conducted a fingernail/scratch-mark comparison, reporting that "indeed and without doubt" the scratches on the accused were made by the victim's fingernails. He acknowledged, however, that he had failed to make test marks with the fingernail, to evaluate the scratch's class and individual characteristics, and to establish the reproducibility of such marks.
 C. State v. Keko
 In still another capital murder case, Dr. West made a bite-mark identification, after exhuming a corpse fourteen months after death. Once again, he used his blue light ("West Phenomenon") technique to visualize the wound, which he then matched to the defendant's teeth. The skin tissue surrounding the mark was removed and placed in a preservative. Two weeks later, however, the preservative had erased the mark. The defendant is serving a life term.
 D. Other Cases
 West estimates that he has testified about fifty-five times over the past decade. A third to one half of these cases were capital prosecutions, and he has only "lost" one case. In 1992, West *Page 750 
matched a bite mark found on a rape victim with the teeth of Jonny Bourn, a positive identification, but DNA analysis of skin taken from fingernail scrapings of the victim conclusively excluded Bourn. In other cases, West identified a footprint on a murdered girl's face, matched a bruise on a murder victim's stomach with a hiking boot belonging to the victim's mother, and testified as a burn pattern specialist.
¶ 64. The instant case went to trial in January, 1992. This was several years before West began to encounter difficulties with the AAFS, ABFO and IAI and, thus, this evidence, which casts serious doubts as to West's credibility, was not before the jury in this case.
¶ 65. It is also worth mentioning that West seems to have difficulty in keeping up with evidence. In the instant case, he lost the not only the mold to Brooks's lower teeth but also the mold of another suspect's teeth. In Banks v. State ,725 So.2d 711, 715-16 (Miss. 1997), this Court was forced to reverse where West testified that the defendant's teeth correlated to marks in a sandwich left at the crime scene but failed to preserve the sandwich so that the defense could make its own comparisons.
¶ 66. Furthermore, West's opinion that "it could be no one else but Levon Brooks that bit this girl's arm" was rendered despite the fact that the wound was comprised of a mere two indentations. As a general rule, the more teeth registered on the wound, the better the comparison. De La Cruz, Forensic Dentistry and the Law: IsBite Mark Evidence Here to Stay?, 24 Am. Crim. L. Rev. 983, 1005 n. 7 (1987) (citing Rawson, Vale, Sperber, Herschaft Yfantis,Reliability of Scoring System of the American Board of ForensicOdontology for Human Bite Marks, 31 J. Forensic Sci. 1235, 1238-39 (1986)); See also Faigman et al., Modern Scientific Evidence at 174. Even West admitted that the typical bite mark consists of indentations made by six teeth.
¶ 67. This Court's apparent willingness to allow West to testify to anything and everything[4] so long as the defense is permitted to cross-examine him may be expedient for prosecutors but it is harmful to the criminal justice system. I believe it is time we did a careful analysis of bite mark testimony — especially that coming from Dr. West — now rather than later or we risk having West become the Ralph Erdmann[5] of Mississippi with the attendant consequence of having to reexamine every case in which West has ever testified.
¶ 68. Therefore, because I believe the introduction of West's testimony was reversible error, I dissent.
[1] See, e.g., People v. Milone, 356 N.E.2d 1350 (Ill. App. Ct. 1976).
[2] Faigman et al. list the following areas as those lacking a consensus in the community of forensic odontologists: 1. The timing of the bite mark injury; 2. Enhancement procedures and techniques (note that in this case, West testified that he used ultraviolet light to enhance the wound enabling him to find "several unique marks" that corresponded to the flaws on the back side of Brooks's teeth; this technique is what allowed West to be positive that only Brooks could have made the two indentations); 3. The type of material for test bites or the accuracy of test bites under various mockup conditions; 4. The pressure necessary to produce the various levels of tissue injury under normal and unusual circumstances has not been reliably measured; 5. Manipulation of various types of distortion to produce correction; 6. The problem faced by forensic dentists today is not necessarily one of matching the bite mark to a set of teeth. It is demonstrating whether another set of teeth could have produced the same or similar mark; 7. There is not universal agreement on which injuries are bite mark related; 8. Research on the minimum number of points of concordance or the minimum number of teeth marks needed in a bite mark for certainty is not as well established as the uniqueness of the dentition. Faigman, et al. § 24-2.3 at 178-80.
[3] West's testimony in the Maxwell case was the cover story in the February, 1996 ABA Law Journal. "Out of The Blue", 82 A.B.A.J. 50 (Feb. 1996), described West as the "dental equivalent of now discredited footprint expert Louise Robbins." West was also profiled by Marcia Coyle, in "Expert" Science Under Fire in Capital Cases, Nat'l L.J., July 11, 1994, at A23.
[4] A Westlaw search reveals that Michael West is apparently the only person testifying about the "science" of "wound pattern analysis". Puckett v. State , 737 So.2d 322 (Miss. 1999); Giles v.State, 650 So.2d 846 (Miss. 1995). In State v. Van Winkle,658 So.2d 198, 200 (La. 1995) (overturning conviction), the court noted that: "[ot]her forensic evidence was provided by Dr. West, a dentist and controversial `wound pattern analyst' from Hattiesburg, Mississippi. He testified that markings on Patrick's stomach were consistent with the soles of tennis shoe hiking boots seized from Patricia's bedroom. A defense expert, Dr. Singer, contested this, finding there was no reasonable correlation between Patrick's bruise pattern and the boot in Patricia's room."
[5] Ralph Erdmann was a Texas pathologist who faked autopsies. Erdmann's misconduct was discovered only when he listed the weight of a deceased's spleen in an autopsy report. The deceased's relatives were puzzled since they knew that the deceased's spleen had been removed years before. Paul Gianelli, The Abuse ofScientific Evidence in Criminal Cases: The Need for IndependentCrime Laboratories, 4 Va.J.Soc.Pol'y Law 439 at 449-50 (1997). In another case, Erdmann reported that a man found dead in a dumpster had died of pneumonia and hypothermia. A second autopsy showed that the deceased had died from a bullet wound to the head. Erdmann Faces New Legal Woes, 81 A.B.A. J. 32 (1995). *Page 751