THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JEFFREY M. ISRAEL, Defendant-Appellant.

Second District   No. 2—87—0793

Opinion filed April 21, 1989.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Dallas C. Ingemunson, State's Attorney, of Yorkville (William L. Browers, John X. Breslin and Vicki Seidl, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Jeffrey M. Israel, appeals from consecutive sentences imposed after entering guilty pleas to aggravated kidnaping and aggravated criminal sexual assault. Defendant raises three issues on appeal: (1) whether the trial court erred in concluding that the emotional distress suffered by the victim constituted a "severe bodily injury" sufficient to warrant consecutive sentences; (2) whether the trial court erred in allowing a psychiatric mental health nurse to give her expert opinion on the risk defendant posed to the community where it was not established that the expert's method for calculating risk had gained general acceptance in her field; and (3) whether the trial court erred in allowing the prosecutor to read a victim impact statement prepared by the victim's family. We affirm.

On April 29, 1987, the Kendall County State's Attorney charged defendant with aggravated kidnaping and aggravated criminal sexual assault stemming from the abduction and sexual assault of an eight-year-old girl the day before. It was alleged that the aggravated kidnaping took place in Kendall County and the aggravated criminal sexual assault took place in La Salle County.

On May 5, 1987, defendant waived his right to a preliminary hearing and pleaded guilty to the charges. Defendant also waived his right to be prosecuted in La Salle County for the aggravated criminal sexual assault. The trial court admonished defendant regarding his rights, the nature of the charges, and the possible penalties he could receive, including the possibility that he could be required to serve his sentences consecutively. Defendant indicated that he understood his rights and that he had no expectation of receiving any particular sen-

tence in exchange for his pleas.

As a factual basis for the pleas, the State averred that the victim was eight years old and lived in Yorkville, Illinois, at the time of the assault. On April 28, 1987, defendant forced the victim into his car as she was riding her bike near her home on her way home from school. Defendant taped her eyes and mouth closed and drove her to an unknown location where he had vaginal intercourse with her. Defendant then drove the victim to a motel parking lot where Kurt Salem, an off-duty police officer working as a security guard, took note of the car and recorded its license plate number. Defendant became alarmed when he saw Salem and drove the victim to a shopping center where he released her. The victim entered a restaurant and received aid. Salem subsequently gave the license plate number to the police, and defendant was arrested after Illinois State police traced the license plate number to his car. Defendant was informed of his *Miranda* rights and subsequently made a full confession. Defendant took investigators to the scene of the sexual assault, the Illini State Park in La Salle County, and identified various pieces of physical evidence found at that location. Defendant stipulated to the State's account of what the evidence would show, and the trial court entered judgment on the pleas.

On June 30, 1987, the trial court held a lengthy sentencing hearing. In aggravation, Illinois State police officer Mike Collins gave a detailed account of defendant's confession. According to Collins, defendant stated that he had planned seducing a very young girl two years prior to April 1987. Defendant chose Yorkville because it was a small, quiet town. On April 27, 1987, defendant was in Yorkville and noticed a girl riding her bike in a secluded area. Defendant decided that if the circumstances were the same on the following day, he would carry out his plan. Defendant prepared for the offense by placing stolen license plates on his car and covering various identification marks and stickers with tape. Defendant also secured the passenger side door handle so that the car could not be opened from the inside. On April 28, 1987, defendant returned to the secluded area where he had observed the girl the day before. When defendant saw the victim approaching, he blocked her path and forced her into the car as she attempted to pass him. Defendant transported the victim to La Salle County, stopping only briefly to tape her eyes and hands and place her on the floor. He then proceeded to the Illini State Park, where he took the victim from the car, removed her clothes below the waist, put her on a towel, and had vaginal intercourse with her. Defendant stated that he slapped the victim once when she screamed.

After the sexual assault, defendant placed a napkin in the victim's crotch when he noticed that she was bleeding from the vagina. Defendant allowed the victim to get dressed but did not allow her to put on her underpants. Defendant removed the tape and stolen plates from his car and left the area. At some point, defendant offered to "hogtie" the victim to a tree and leave her. When defendant saw that his comment alarmed the victim, he told her that he planned to take her home. Defendant continued driving and stopped on several occasions, first to allow the victim to go to the bathroom, and later at a fast-food restaurant where he bought her something to drink. Defendant removed the tape from the victim's eyes and transported her to Morris, Illinois. Defendant stated that he was searching for the Morris Hospital but could not find it. Defendant subsequently parked in a motel parking lot but became nervous when he saw someone wearing handcuffs on his belt. Defendant then drove to another fast-food restaurant where he released the victim and told her to tell the people in the restaurant what had occurred. Defendant stated that the victim was afraid to walk into the restaurant alone, so he accompanied her about three-quarters of the way. The victim subsequently walked into the restaurant, and defendant returned to his car and drove to his home in Joliet.

Illinois State police sergeant Jack Townsend testified that he executed search warrants for defendant's apartment and car. Townsend identified the State's exhibits Nos. 12 through 50 and 55 through 75 as photographs depicting defendant's car and apartment and their contents, including pornographic material and sexual aid devices. Townsend stated that no weapons were found in either location.

The State next presented the testimony of Dr. Ann Burgess, a professor of psychiatric mental health nursing at the University of Pennsylvania. Dr. Burgess testified that she had a doctorate degree in psychiatric mental health nursing and had participated as both a student and an instructor in course work and seminars relating to sexual offenders and their victims. Dr. Burgess also noted that she was involved with several studies in related areas and had published several books, monographs, and articles based on her research. Dr. Burgess testified that she was hired by the State in this case to give her opinion regarding the impact of the offenses on the victim and the risk defendant posed to the community. Dr. Burgess stated that she had previously rendered expert opinions approximately 24 to 36 times in courts of 12 States. Approximately 90% of those cases involved testimony regarding victim impact. Dr. Burgess stated that she testified two or three times regarding the risk an offender posed to the community.

Dr. Burgess was cross-examined on her qualifications, particularly as to her ability to render an opinion on the risk defendant posed to the community. Dr. Burgess testified that she evaluated the risk an offender posed to the community using five criteria: (1) commitment to deviate behavior; (2) planned crime sequence; (3) preoccupation with sexually deviate behavior; (4) prior family and social response; and (5) escalation of deviate behavior. Dr. Burgess stated that these criteria were derived over the years by her colleagues and herself. Dr. Burgess testified that she rated an offender on a scale of 1 to 10 in each criterion, with 10 being the highest risk. She then totaled the ratings to determine the risk the offender posed to the community. In evaluating defendant, Dr. Burgess stated that she reviewed the police reports, photographs, defendant's psychiatric and employment records, and the victim's hospital records. Dr. Burgess stated that she did not interview defendant.

Defendant accepted Dr. Burgess on her qualifications to testify regarding victim impact, but objected to Dr. Burgess testifying as an expert on the risk defendant posed to the community. The court then asked Dr. Burgess to identify studies she had done regarding the risk an offender poses to the community. Dr. Burgess stated that she participated in studies of 36 serial murderers, 41 serial rapists, juveniles who have raped and murdered, and an on-going study of child abductors. Dr. Burgess stated that the results of those studies had been published in the American Journal of Psychiatry, the Journal of Interpersonal Violence, and Behavior Science and the Law. The court then asked Dr. Burgess whether her results had been accepted by experts who were authorities in the treatment and diagnosis of psychiatric disorders. Dr. Burgess responded by reiterating that the results of her studies were published and that the serial homicide study was cited in an article published in an unidentified journal. Although noting that Dr. Burgess' qualifications were limited, the court concluded that they were sufficient to give an opinion at the sentencing hearing.

Dr. Burgess then explained how she rated defendant on each of the five criteria and what facts she considered relevant under each. Dr. Burgess testified that defendant received an overall rating of 45 out of a possible 50 points, thus classifying him as a "severe risk." In the course of discussing her ratings of defendant, Dr. Burgess characterized him as a pedophile and sexual sadist. Dr. Burgess concluded that the rehabilitative outlook for defendant was "guarded *** given the state of expertise and treatment of this type of deviation."

On cross-examination, Dr. Burgess was confronted with defendant's group exhibit No. 1, a report entitled "The Treatment of Child

Molesters." Dr. Burgess indicated that she was familiar with the report, but stated that it did not evaluate "aggressive" pedophiles such as defendant and did not use a complete sample from which to accurately evaluate its success.

Dr. Burgess also gave her opinion regarding victim impact. Dr. Burgess characterized the impact on the victim in this case as "severe" and went on to discuss symptoms which were mentioned in the victim impact statement prepared for the court. Dr. Burgess predicted that the victim would have mental health problems relating to these offenses.

The State also presented the testimony of Dr. Mark Kijek, the obstetrician and gynecologist who treated the victim at Morris Hospital after the assault. Dr. Kijek stated that the victim received a second degree vaginal laceration approximately five centimeters long which could have been caused by a blunt object such as an adult penis. Dr. Kijek testified that he repaired the laceration, but noted that while it healed normally, it might result in scarring. Dr. Kijek also testified that the victim received a superficial cheek injury.

Finally, the State introduced a written victim impact statement. Defendant objected on the basis that it was not clear who prepared the statement. The court noted that the statute authorizing consideration of such evidence required that the victim impact statement be prepared in writing in conjunction with the State's Attorney's office. The prosecutor authenticated the statement, and the court allowed her to read it in open court over defendant's objection.

In mitigation, defendant's father testified that he married defendant's mother and adopted defendant when defendant was a small child. Mr. Israel testified that defendant's performance throughout school was seriously impeded by a learning disability that was not diagnosed until defendant was a teenager. Mr. Israel further testified that defendant saw several mental health and school counselors during the course of growing up. After leaving high school and holding various jobs, defendant enlisted in the Army for three years. In October 1986, defendant entered a 16-week management training program with a national restaurant chain and was eventually assigned to work in a restaurant in Joliet. Mr. Israel testified that he and his wife would do whatever was necessary, financially or otherwise, to provide defendant with treatment. Defendant's mother echoed her husband's commitment to provide defendant with whatever was necessary for his rehabilitation.

Dr. Robert Chapman, a psychiatrist who treated defendant at Brokaw Hospital in 1978, also testified on defendant's behalf. Dr. Chap-

man stated that he was experienced in the treatment of pedophiles, but noted that they made up a small percentage of his practice. Dr. Chapman further testified that he had evaluated approximately 300 such cases for courtroom testimony. Dr. Chapman testified that he had two interviews with defendant in connection with this case. During one of the sessions, Dr. Chapman gave defendant a personality profile test. Dr. Chapman characterized defendant as a pedophile. Dr. Chapman stated that defendant's condition was treatable and discussed various treatment alternatives available to defendant. Among the available treatments, Dr. Chapman opined that defendant would be most responsive to pharmacological, or drug-related, treatment. Dr. Chapman also noted that defendant recognized his condition and was motivated to get help. According to Dr. Chapman, defendant's relative inexperience as a pedophile increased his likelihood for successful treatment. Dr. Chapman stated that the passage of time would not improve defendant's pedophilia and might render it more difficult to treat. On cross-examination, Dr. Chapman stated that he considered defendant to be a risk to the community if left untreated. Dr. Chapman based his opinions on information gathered from interviews with defendant, the test results, police reports, defendant's confession, and other facts and circumstances of the offenses such as the nature of the sexually orientated paraphernalia and literature that were taken from defendant's apartment.

Upon rendering sentence, the court noted that both Drs. Burgess and Chapman thought that defendant was a risk to the community. The court concluded that defendant should be sentenced to the maximum allowed by the law and noted that, because the victim suffered a severe bodily injury as a result of the assault, defendant could be sentenced to consecutive prison terms. Specifically, the court noted that the victim suffered a vaginal laceration and emotional distress. The court subsequently sentenced defendant to serve consecutive terms of 30 years' imprisonment for aggravated criminal sexual assault and 15 years' imprisonment for aggravated kidnaping. The court thereafter admonished defendant regarding his right to appeal and of the necessity to first file a written motion to vacate his plea and the sentence.

On July 28, 1987, defendant filed a "post-hearing" motion seeking a new sentencing hearing or a reduced sentence. That motion alleged, among other things, that his sentences were improper since the victim did not suffer a severe bodily injury sufficient to warrant consecutive terms and because the victim impact statement was prepared by someone other than the victim and should not have been read in open court. At the hearing on the motion, the trial judge acknowledged

that although he initially questioned whether the victim's injuries were sufficient to warrant consecutive terms, his decision was supported by the testimony of the physician who treated the victim at Morris Hospital and also case law standing for the proposition that emotional distress is a "severe bodily injury" sufficient to qualify defendant for consecutive terms. The court subsequently denied defendant's motion, and defendant brought this timely appeal.

■■ Before addressing the arguments raised by defendant, we note that we have jurisdiction to hear this appeal pursuant to the recent decisions of *People v. Wilk* (1988), 124 Ill. 2d 93, and *People v. Favelli* (1988), 176 Ill. App. 3d 618. Those cases stand for the proposition that a defendant need not file a written motion to withdraw a guilty plea pursuant to Supreme Court Rule 604(d) (107 Ill. 2d R. 604(d)) as a condition precedent to an appeal from his sentence where the defendant presented a timely motion seeking reconsideration of his sentence. (*Wilk*, 124 Ill. 2d at 110; *Favelli*, 176 Ill. App. 3d at 622.) In the instant action, as in *Wilk* and *Favelli*, defendant is only appealing his sentence after having filed a motion to reconsider the sentence with the trial court. Defendant was therefore not required to file a motion to withdraw his guilty plea, and this court has jurisdiction to consider his appeal.

■■ ■ Defendant first contends that the trial court erred in sentencing him to consecutive prison terms after concluding that the victim suffered a "severe bodily injury." Defendant argues that the trial court improperly found that the emotional distress suffered by the victim constituted a "severe bodily injury" under the statute authorizing consecutive sentences. We need not address the propriety of the trial court's references to emotional distress since we find a sufficient basis in its ruling for imposing consecutive sentences on other grounds.

At issue between the parties is the trial court's interpretation of section 5—8—4(a) of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a)). The version of section 5—8—4(a) applicable at defendant's sentencing hearing provided, in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony *and the defendant inflicted severe bodily injury*, in which event the court may enter sentences to run consecutively." (Emphasis

added.) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).)

It is well settled that the trial court is in the best position to tailor a sentence or other disposition to the needs of the case. (*People v. Steppan* (1985), 105 Ill. 2d 310, 323; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) A trial court's decision with regard to sentencing is entitled to great deference, and a reviewing court should not substitute its judgment for that of the sentencing court absent an abuse of discretion. *Steppan*, 105 Ill. 2d at 323; *Perruquet*, 68 Ill. 2d at 154.

Defendant's argument that the trial court abused its discretion in applying section 5—8—4(a) of the Code to the instant action relies extensively on the court's references to the emotional distress suffered by the victim. However, a complete review of the record in this case indicates that the court was equally cognizant of the victim's *physical* injuries. The victim suffered a five-centimeter vaginal laceration as a result of the assault. The State referred to the vaginal laceration at both the sentencing hearing and the argument on the "post-hearing" motion. More importantly, the court referred to the vaginal laceration in concluding that the victim suffered a "severe bodily injury."

Specifically, at the sentencing hearing, the court stated:

> "I believe under the circumstances that, *the vaginal tear is a*—and also the emotional distress which Justice Unversagt [*sic*] cites the emotional distress of the victim, *those* can be considered by the Court as severe bodily injury ***." (Emphasis added.)

Subsequently, at the argument on the "post-hearing" motion, the court stated:

> "Now, I had some problem, some question in my own mind as to the consecutive sentencing at the time and as to whether or not there was great bodily harm inflicted. After listening to Mr. Ingemunson's—*or after listening to the testimony of the attending physician and Mr. Ingemunson's argument on that particular situation* and also there was, I think it was an opinion by Justice Unverzagt, but at least there was one of the cases which the State cited which indicated that the emotional distress from the sexual assault was great bodily harm and justified a consecutive sentence and I took *those* into consideration ***." (Emphasis added.)

The testimony of the attending physician referred to by the court was that of Dr. Kijek, who described the extent of the victim's *physical* injuries, and, specifically, the five-centimeter vaginal laceration.

From these comments, it becomes apparent that notwithstanding the court's references to emotional distress, the court concluded that

the vaginal laceration was a "severe bodily injury" sufficient to impose consecutive sentences under section 5—8—4(a) of the Code. That injury, standing alone, is sufficient to warrant consecutive sentences under the Code. (See *People v. Knight* (1985), 139 Ill. App. 3d 188, 196-97.) In *Knight*, the defendant challenged his consecutive sentences on the basis that the victim did not suffer a "severe bodily injury." (139 Ill. App. 3d at 196-97.) The court noted that the victim suffered a vaginal laceration which required stitches and also had scars on her breasts. (139 Ill. App. 3d at 197.) The court stated that these injuries were manifestly "sufficient for the trial court in its discretion to find that severe bodily injury had been inflicted." 139 Ill. App. 3d at 197.

Accordingly, we conclude that the trial court did not abuse its discretion in sentencing defendant to consecutive terms of imprisonment under section 5—8—4(a) of the Code.

■■ ■ Defendant next contends that the trial court erred in allowing Dr. Burgess to testify regarding the risk defendant posed to the community. Defendant asserts that Dr. Burgess' opinion was improperly admitted because it was based on theories which had not been generally accepted in the scientific community to which she belonged. Specifically, defendant argues that Dr. Burgess' use of a numerical rating system to determine the risk defendant posed to the community was not established to have gained general acceptance in the field of psychiatric mental health nursing and was therefore not reliable. We disagree.

Initially, it should be noted that defendant did not raise this issue in his written "post-hearing" motion seeking a new sentencing hearing or a reduced sentence. In *Favelli*, we noted that just as an issue not raised in a written motion to withdraw a guilty plea would be waived on appeal, an issue not raised in a written motion seeking a new sentencing hearing or a reduced sentence would be waived on the same basis. (*People v. Favelli* (1988), 176 Ill. App. 3d 618, 623.) Accordingly, because defendant failed to raise this issue in his "post-hearing" motion, we consider it waived on review.

In any event, defendant's argument on the merits is misplaced. In arguing that the State failed to establish that Dr. Burgess' theories for calculating the risk defendant posed to the community were generally accepted in her scientific field, defendant seeks to subject her testimony to the requirements of *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. *Frye* set forth the standard for determining whether a *scientific principle, technique, or test* is sufficiently reliable to be admitted into evidence. (See 293 F. at 1014.) That standard has been adopted in Illinois and requires that the theory first have gained

general acceptance in the expert's scientific field. *People v. Jordan* (1984), 103 Ill. 2d 192, 208; *People v. Baynes* (1981), 88 Ill. 2d 225, 241; *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 9; see *Frye*, 293 F. at 1014.

In support of his argument that Dr. Burgess' testimony was improper, defendant relies heavily on our decision in *Ferguson*. In *Ferguson*, the State's expert was an anthropologist who testified that the wear patterns on the soles of shoes are unique to the individual who wears the shoes, and that by measuring the wear patterns on the soles of different pairs of shoes, she could determine within a reasonable degree of scientific certainty whether the same person wore both pairs of shoes. (*Ferguson*, 172 Ill. App. 3d at 9.) In concluding that the expert's testimony was improper, we noted that she was the only person in her field who believed that an identification was possible by measuring wear patterns on different pairs of shoes. 172 Ill. App. 3d at 12.

■■ Unlike *Ferguson*, no scientific theory or test is involved in the instant action, and therefore the *Frye* general acceptance test is not applicable. (See E. Cleary & M. Graham, Handbook of Illinois Evidence §702.1, at 453 (4th ed. 1984) ("Expert testimony is not limited to scientific or technical areas, but rather includes all areas of specialized knowledge").) Rather, Dr. Burgess, as a psychiatric mental health nurse, testified regarding various factors she considered in determining the level of risk defendant posed to the community. Defendant does not challenge those factors as improper, but rather takes issue with Dr. Burgess' use of assigning a *numerical score* to each factor to come up with a *total score* for assessing risk. Dr. Burgess' use of a numerical rating system for each factor is nothing more than an express statement of the weight she gave each factor in its contribution to defendant's dangerousness. Similarly, in *People v. Eckhardt* (1987), 156 Ill. App. 3d 1077, 1093, we stated that a psychiatrist is entitled to determine what information he or she regards as relevant in reaching a diagnosis, *and the methodology used by the psychiatrist is only one factor the trier of fact may take into account in weighing the psychiatrist's opinion.*

Accordingly, we conclude that the trial court did not err in admitting Dr. Burgess' testimony.

■■■ Defendant next contends that the trial court erred in allowing the prosecutor to read the victim impact statement into the record and in permitting the testimony of Dr. Burgess on victim impact. Defendant first argues that use of the victim impact statement was error because it was not prepared "in conjunction with the Office of

the State's Attorney" as required by the statutes authorizing victim impact statements to be used at sentencing. In support of his position that the statutory requirements were not followed, defendant points to certain evidence indicating that the victim impact statement was obtained by the probation officer rather than the State.

Initially, we note that defendant has waived consideration of this argument by failing to raise it in his "post-hearing" motion. (See *People v. Favelli* (1988), 176 Ill. App. 3d 618, 623.) A review of defendant's objections to use of the victim impact statement at the sentencing hearing and the allegation of error raised in defendant's "post-hearing" motion indicates that defendant only challenged the victim impact statement on the basis that it was not written by the victim herself. Defendant did not argue at any point prior to this appeal that introduction of the victim impact statement was improper because it was not prepared "in conjunction with the Office of the State's Attorney." Thus, we consider this issue waived on review.

Even if we were to consider this issue on the merits, we would decide it against defendant. Section 6 of the Bill of Rights for Victims and Witnesses of Violent Crime Act (Victims' Act) (Ill. Rev. Stat. 1985, ch. 38, par. 1406) permits the victim of a violent crime to address the court concerning the impact of the crime. That section further provides, in pertinent part:

> "If the victim chooses to exercise this right, *the impact statement must have been prepared in writing in conjunction with the Office of the State's Attorney* prior to the initial hearing or sentencing, before it can be presented orally at the sentencing hearing." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 1406.)

Similarly, section 5—4—1(a)(6) of the Code affords the victim of a violent crime the opportunity to make a victim impact statement, but provides "that the statement and evidence offered in aggravation or mitigation must first be *prepared in writing in conjunction with the State's Attorney* before it may be presented orally at the hearing." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1(a)(6).

Defendant interprets the phrase "prepared in writing in conjunction with the Office of the State's Attorney" as requiring that the State actually prepare or obtain the statement from the victim. Defendant does not support this interpretation with any authority, and we will not impose such a meaning here. Rather, notwithstanding the identity of the entity that actually took the statement from the victim, it is clear that the victim impact statement in the instant action was prepared *"in conjunction* with the Office of the State's At-

torney." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 1406.) Indeed, it was the *State* that presented the evidence. Moreover, the assistant State's Attorney who presented the evidence in fact represented to the court that the statement was presented in conjunction with her office. Accordingly, we find defendant's argument on this issue to be without merit.

■■ ■ Defendant next argues that the trial court erred in introducing the victim impact statement on the basis that it was prepared by the victim's parents rather than the victim. We disagree.

"Victim," as defined under the Victims' Act and the Code, includes, among others, the parent of any person granted rights under the Victims' Act who is physically or mentally incapable of exercising such rights. (See Ill. Rev. Stat. 1985, ch. 38, par. 1403(a)(3); Ill. Rev. Stat. 1985, ch. 38, par. 1005—1—22.) Thus, by virtue of this statutory definition, the parents of a victim may prepare the victim impact statement where the victim is incapable of exercising her rights.

In *People v. Rainey* (1986), 149 Ill. App. 3d 327, 331, cited by defendant, the mother of a 12-year-old sexual assault victim prepared a victim impact statement. The victim had testified at the defendant's trial. (149 Ill. App. 3d at 331.) In holding that it was error for the trial court to have permitted the mother to prepare the victim impact statement and testify as the parent of a person unable to exercise her own rights, the court stated that there was nothing in the record to indicate that the victim's condition had deteriorated so drastically in the 29-day interval between the trial and sentencing hearing. 149 Ill. App. 3d at 331.

Subsequently, in *People v. Reid* (1987), 160 Ill. App. 3d 491, 494, the court held that the parents of a seven-year-old sexual assault victim could prepare the victim impact statement on behalf of their daughter. The *Reid* court distinguished *Rainey*, noting that *Rainey* dealt with a 12-year-old victim whose ability to meaningfully communicate the impact of the crime was not in question. (160 Ill. App. 3d at 494.) The court stated that "[s]imply because the seven-year-old victim was found competent to testify and that she could relate the facts of what happened to her *does not mean she is capable of preparing a written statement about the physical and emotional impact of the crime on her life.*" (Emphasis added.) (160 Ill. App. 3d at 494.) The standard for whether a victim is mentally capable of drafting a written victim impact statement depends on the victim's age *coupled with her ability to communicate.* See *People v. Van Ostran* (1988), 168 Ill. App. 3d 517, 523.

In the instant action, the victim was eight years old at the time of

the assault and defendant's sentencing. Because defendant entered guilty pleas, the victim was not asked to testify. In any event, there is a basis in the record for us to conclude that she was not capable of preparing her own victim impact statement. In the presentence investigation report, the probation officer stated that he did not ask the victim to prepare a victim impact statement due to her age *and emotional state*. Moreover, that report further indicated the victim was at that time undergoing psychological counseling. Given these representations about the victim's mental health and her tender age, it is highly unlikely that she was "capable of preparing a written statement about the physical and emotional impact of the crime[s] on her life." See *Reid*, 160 Ill. App. 3d at 494.

Accordingly, we conclude that the trial court did not err in allowing the victim impact statement to be read into the record.

■■ Defendant's final contention is that the trial court erred in permitting Dr. Burgess to testify regarding the impact the crimes had on the victim. The record clearly indicates that defendant in fact accepted Dr. Burgess as an expert witness to testify regarding victim impact, and no objection was voiced when she rendered her opinion. Accordingly, this issue is waived.

For all of the reasons set forth above, we affirm the judgment of the trial court.

Affirmed.

DUNN and McLAREN, JJ., concur.